IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| D.B., (a minor child), by and through her Next Friend, SHASHONA BECTON, | § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 4:16-cv-00965 |
| DAVID ERIC CASEBOLT, Individually and in his official capacity, and THE CITY OF MCKINNEY, TEXAS, | § § § § | |
| *Defendants*. | § § § | |

## DEFENDANT'S, THE CITY OF MCKINNEY'S, AMENDED MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

COME NOW, the City of McKinney, Texas (hereinafter the "**City**" or "**McKinney**") and, file its *Amended Motion to Dismiss and, in the Alternative, Motion for Summary Judgment* (the "McKinney Motion"). McKinney respectfully requests that the Plaintiff's claims against McKinney be dismissed entirely and with prejudice. In support thereof, McKinney would respectfully show this Honorable Court the following:

## TABLE OF CONTENTS

I.      SUMMARY ....................................................................................................1

II.     SUMMARY OF CLAIMS AND ALLEGATIONS ......................................1
        A.      Plaintiff's Allegations and Admissions ................................................1

III.    IDENTIFICATION OF LIVE PLEADINGS AND ISSUES ...........................5
        A.      Claims & Defenses in Live Pleadings ...................................................5
        B.      Issues to Be Decided ............................................................................7

IV.     STATEMENT OF UNDISPUTED MATERIAL FACTS .................................8

V.      LEGAL STANDARDS FOR DISMISSAL AND SUMMARY JUDGMENT................14
        A.      Standard for Dismissal under Rule 12(b)(6) .........................................14
        B.      Standard for a Traditional Motion for Summary Judgment....................16
        C.      Standard for a No-Evidence Motion for Summary Judgment ...............17

VI.     CLAIMS SUBJECT TO RULE 12(b)(6) DISMISSAL ...................................18
        A.      Failure of Municipal Liability Claims Against McKinney (Issue
                Nos. 1-3) ...............................................................................................18
                1.      Plaintiff Fails to Plead Basic Facts .........................................18
                2.      Plaintiff Fails to Plead a Policy and Policymaker....................20
        B.      Plaintiff Fails to Adequately Plead a Failure-to-Train Claim (Issue
                No. 4) .....................................................................................................26
                1.      Plaintiff Fails to Identify Specific Training Allegedly
                        Causing Plaintiff's Injuries. ....................................................27
        C.      Failure of State-Law Claims Against McKinney (Issue No. 5).............30
                1.      Plaintiff Indicated an Intent to Nonsuit Her State-Law
                        Claims. ....................................................................................30
                2.      Plaintiff Fails To Plead Waiver of Immunity ...........................30
                3.      Plaintiff Cannot Plead Waiver of Immunity .............................31
        D.      Plaintiff's Claims for Exemplary Damages Fail as a Matter of Law
                (Issue No. 6)...........................................................................................34
                1.      Plaintiff Indicated an Intent to Nonsuit Her Claim For
                        Exemplary Damages. ...............................................................34
                2.      Texas Law Does Not Authorize Exemplary Damage
                        Claims Against the Government. ..............................................34

VII.    CLAIMS SUBJECT TO SUMMARY JUDGMENT .......................................35
        A.      Plaintiff's Claims Against McKinney Fail as a Matter of Law. ............35
                1.      Plaintiff Fails to Produce Evidence Raising a Fact Issue for
                        Policy and Final Policymaker (Issue Nos. 7 and 8) .................36
                2.      Plaintiff Fails to Produce Evidence Supporting a
                        Constitutional Violation (Issue No. 9) .....................................37

       3.     Plaintiff Fails to Produce Evidence Raising a Fact Issue for a Policy as the Moving Force of a Constitutional Violation (Issue No. 10) ............................................................................................40

  B.    Plaintiff's Failure-to-Train Claim Fails as a Matter of Law (Issue No. 11) ...................................................................................................40

  C.    McKinney is Entitled to Summary Judgment on All State-Law Claims (Issue No. 12) ..................................................................................41

  D.    McKinney is Entitled to Summary Judgment on All Claims for Exemplary Damages (Issue No. 13) .....................................................42

VIII.   CONCLUSION AND PRAYER ...................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 1, 29

*Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996) ................................................... 15, 27, 40

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 15

*Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984) ....................................... 19, 20

*Bishop v. Arcuri*, 674 F.3d 456 (5th Cir. 2012) ........................................................ 18

*Board of County Commissioners of Bryan County. v. Brown*, 520 U.S. 397 (1997)................... 19

*Bolton v. City of Dallas*, 541 F.3d 545 (5th Cir. 2008).......................................... 21

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ........................................................... 39

*Brown v. City of Houston*, 8 S.W.3d 331 (Tex. App.—Waco 1999)..................................... 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). ...................................................... 17

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). ..................................................... 20

*City of Canton v. Harris*, 489 U.S. 378 (1989)................................................. 26, 28

*City of El Paso v. W.E.B. Investments*, 950 S.W.2d 166(Tex. App.—El Paso 1997, writ denied) ........................................................................................................ 32

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986)................................................. 37

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) ..................................... 35

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) ...................................... 20, 35

*Colle v. Brazos County*, 981 F.2d 237 (5th Cir. 1993) ............................................. 19

*Conner v. Travis Cty.*, 209 F.3d 794 (5ᵗʰ Cir. 2000)........................................... 27, 40

*Cozzo v. Tangipahoa Parish Council-President Government, et al.*, 279 F.3d 27 (5ᵗʰ Cir. 2002) ........................................................................................................ 27, 40

*Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108 (5th Cir. 2005)................... 18

*Dallas County Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339 (Tex. 1998) ........................................................................................................ 30, 31

*Delaney v. University of Houston*, 835 S.W.2d 56 (Tex. 1992) ................................... 34

*Dorward v. Ramirez*, Civil Action No. 3:09-CV-0018-D, 2009 U.S. Dist. Lexis 77710 (N.D. Tex. 2009) ................................................................................................ 35

*Drewitt v. Pratt*, 999 F.2d 774 (4th Cir. 1993) ...................................................... 17

*Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308 (5th Cir. 1995)................................ 17

*Duhart v. State*, 610 S.W.2d 740 (Tex. 1980) ........................................................ 31

*Eason v. Thaler*, 73 F.3d 1322 (5ᵗʰ Cir. 1996). ................................................. 16, 36

*Epps v. NCNB Nat'l Bank,\ 838 F. Supp. 296 (N.D. Tex. 1993)..................................... 16

*Federal Sign v. Texas Southern University*, 951 S.W.2d 401 (Tex. 1997)............................. 30

*Flores v. City of Palacios,* 381 F.3d 391 (5th Cir. 2004) ........................................ 38

*Forsyth v. Barr*, 19 F.3d 1527, 1533 (5ᵗʰ Cir. 1994), *cert. denied*, 513 U.S. 871 (1994) ............ 17

*Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992). ..................................... 17

*G.M. v. Shelton*, 595 Fed. App'x. 262 (5th Cir. 2014) ............................................ 19

*Gelin v. Housing Authority of New Orleans*, 456 F.3d 525 (5th Cir. 2006)......................... 35

*Gladden v. Roach*, 864 F.2d 1196 (5th Cir. 1989)................................................. 37

*Gonzales v. Ysleta Independent School District*, 996 F.2d 745, 757 (5th Cir. 1993) ................... 27

*Gonzalez v. Kay*, 577 F.3d 600 (5th Cir. 2009) ......................................................... 15

*Graham v. Connor*, 490 U.S. 386 (1989) .............................................................. 39

*Haggerty v. Texas S. Univ.*, 391 F.3d 653 (5th Cir. 2004) .......................................... 37

*Harris County v. Sykes*, 136 S.W.3d 635 (Tex. 2004) ............................................... 30

*Harris v. Galveston County*, 799 S.W.2d 766 (Tex. App.—Houston [14th Dist.] 1990, writ denied) ............................................................................................... 33

*Hernandez v. Igloo Prod. Corp. Retirement Plan*, 868 F. Supp. 200 (S.D. Tex. 1994) ............... 17

*Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293 (5th Cir. 2004) ............................................................................................. 18, 19

*Kassen, R.N. v. Hatley*, 887 S.W.2d 4 (Tex. 1994) .................................................. 33

*Kerrville State Hospital v. Clark*, 923 S.W.2d 582 (Tex. 1996) .................................... 31

*Lamar University v. Doe*, 971 S.W.2d 191 (Tex. App.—Beaumont 1998) ................................ 30

*LeLeaux v. Hamshire-Fannett ISD*, 835 S.W.2d 4 (Tex. 1992) ........................................ 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........................... 16

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) ............................. 6

*Morgan v. Hubert*, 335 F. App'x. 466 (5th Cir. 2009) .............................................. 16

*Nebraska v. Wyoming*, 507 U.S. 584 (1993); ......................................................... 18

*Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) .................................................... 26

*Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir. 2009) ..................................... 39

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ................................................ 21

*Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009) ..................................... 20

*Piazza v. Mayne*, 217 F.3d 239 (5th Cir. 2000) ..................................................... 38

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) .................................. 27, 29, 40

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) ...................................... 19

*Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013) ............................................. 38, 39

*Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) ................................................... 17

*Rios v. City of Del Rio, Texas*, 444 F.3d 417 (5th Cir. 2006) ..................................... 37

*Roberts v. Prator*, 397 F.3d 287 (5th Cir. 2005) ................................................... 26

*Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011) ............................................... 38, 39

*Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389 (5th Cir. 1999) .................................... 37

*Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983) .................................. 33

*Sanders v. Schulze,* No. 3:15-CV-89-N, 2015 U.S. Dist. LEXIS 126576 (N.D. Tex. Aug. 31, 2015) ................................................................................................ 37

*Saucier v. Katz*, 533 U.S. 194 (2001) ............................................................... 39

*Schaefer v. City of San Antonio*, 838 S.W.2d 688 (Tex. App.—San Antonio 1992) ................ 31, 32

*Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998) ................................................ 26

*Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162 (5th Cir. 1997) ................ 19, 20, 25

*State Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575 (Tex. 2001) ................................... 33

*Texas Department of Transportation v. Jones*, 8 S.W.3d 636 (Tex. 1999) ............................ 30

*Texas Natural Resource and Conservation Commission v. White*, 13 S.W.3d 819 (Tex. App.—Fort Worth 2000) ..................................................................................... 32

*Tittle v. Raines*, 231 F. Supp. 2d 537 (N.D. Tex. 2002), *aff'd*, 69 F. App'x 658 (5th Cir. 2003).. 38

*Townsend v. Memorial Medical Center*, 929 S.W.2d 264 (Civ. App. 1975) ............................. 34

*United States v. Arvizu*, 534 U.S. 266 (2002) ........................................................ 37, 38
*United States v. Cortez*, 449 U.S. 411 (1981) ................................................................ 38
*University of Texas Medical Branch at Galveston v. Hohman*, 6. S.W.3d 767 (Tex. App.—
    Houston [1st Dist.] 1999, pet. denied) ................................................................... 34
*University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175 (Tex. 1994) ..... 30, 31
*West v. Atkins*, 487 U.S. 42 (1988) ............................................................................. 37
*Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206 (5th Cir. 2009) ......................................... 17

### Statutes/Rules

Civ. Prac. & Rem. Code § 101.101 ................................................................................ 33
42 U.S.C. § 1983 ............................................................................................... passim
Fed. R. Civ. P. 12(b)(6) ................................................................................... 7, 14, 15
Fed. R. Civ. P. 56(a) ........................................................................................... 16
Fed. R. Civ. P. 8(a)(2) ......................................................................................... 15
Tex. Civ. Prac. & Rem. Code § 101.021 ........................................................................ 32
Tex. Civ. Prac. & Rem. Code § 101.022 ........................................................................ 33
Tex. Civ. Prac. & Rem. Code § 101.024 ........................................................................ 35
Tex. Civ. Prac. & Rem. Code § 101.104 ........................................................................ 41
Tex. Civ. Prac. & Rem. Code §101.057(2) ...................................................................... 33
Texas Penal Code § 38.15 ................................................................................... 12, 38

# I.     SUMMARY

Shashona Becton brings this lawsuit on behalf of D.B., a minor child ("Plaintiff") against Corporal David Eric Casebolt, individually, and in his Official Capacity as a Police Officer of the McKinney Police Department ("MPD"), and against the City of McKinney. However, *Plaintiff's Amended Complaint* (Doc. 50) fails to provide sufficient factual allegations to adequately explain how McKinney violated Plaintiff's constitutional rights. The undisputed facts confirm the McKinney Defendants' constitutional conduct.

Specifically, Plaintiff fails to allege facts sufficient to establish that any McKinney policymaker had a policy or widespread practice/custom that caused a violation of Plaintiff's constitutional rights. Without adequate factual detail, Plaintiff's conclusory allegations as to the City and MPD are insufficient to state a claim for relief that is plausible on its face under the governing standards. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Consequently, McKinney seeks dismissal of Plaintiff's claims against it.

Additionally, the indisputable evidence conclusively negates Plaintiff's allegations of excessive force, false arrest and inadequate training; it shows there was no constitutional violation. Plaintiff neither pleads nor can she prove a valid waiver of McKinney's governmental/sovereign immunity for Plaintiff's state-law claims, and such claims should therefore be dismissed. As such, McKinney respectfully requests that summary judgment be granted in its favor on both traditional and no-evidence grounds.

# II.     SUMMARY OF CLAIMS AND ALLEGATIONS

## A. PLAINTIFF'S ALLEGATIONS AND ADMISSIONS

Plaintiff, a minor, alleges that she was invited to and attended a pool party at Craig Ranch, a subdivision in the McKinney, Texas on June 5, 2015. *Amended Complaint*, Doc. 50, p.

4 ¶ 13. MPD was called to the pool for a "disturbance." *Id*. Plaintiff alleges that no one alleged or accused Plaintiff of breaking the law or committing any crime. *Id*. MPD Corporal David "Eric" Casebolt was one of the senior officers on scene. *Id*.

Plaintiff alleges that Corporal Casebolt "began yelling and shouting obscenities at the black youth" upon his arrival to the scene. *Id*. at ¶ 14. Plaintiff admits she understood that Corporal Casebolt had already detained some individuals prior to instructing her to leave. *Id*. at ¶¶ 14-16.

Plaintiff admits that Cpl. Casebolt approached the Plaintiff and several other minor teenagers and requested that they leave the area. *Amended Complaint*, Doc. 50, pp. 5-6 ¶ 18-20. Plaintiff alleges that she did not converse with Cpl. Casebolt, did not make any attempt to interfere with Cpl. Casebolt's duties, and did not make any effort to engage with Cpl. Casebolt in any manner whatsoever. *Id*. at ¶ 21. Plaintiff alleges that "Casebolt apprehended [Plaintiff] for simply SPEAKING." *Id*. Plaintiff alleges that there was no probable cause for Cpl. Casebolt to approach or apprehend Plaintiff. *Id*. at ¶ 22.

Plaintiff alleges that Cpl. Casebolt grabbed Plaintiff by the wrist. *Id*. at ¶ 23. Plaintiff alleges that Cpl. Casebolt "twisted [Plaintiff's] arm behind her back and threw her to the ground" and "repeatedly called her a 'motherf***er' as he violently swung her around and threw her on the ground." *Id*. at ¶ 23. Plaintiff alleges Cpl. Casebolt "yanked [Plaintiff] up by her arm and viciously slammed [her] on the concrete sidewalk." *Id*. at ¶ 24.

Plaintiff admits that during the struggle, other teenagers rushed towards Cpl. Casebolt, including two teen males which prompted Casebolt to unholster his firearm. *Id*. at ¶ 25.

Plaintiff alleges that "despite her compliance, Casebolt pulled [Plaintiff] up from her seated position and then yelled 'Get on the ground!' as he slammed her back to the ground."[1] *Id.* at ¶ 27. Plaintiff alleges that Cpl. Casebolt "pulled [Plaintiff's] hair several times during this violent encounter as he repeatedly slammed her face into the ground. *Id.* at ¶ 27. Plaintiff alleges Cpl. Casebolt "straddled [Plaintiff] thrusting one knee into her back and one knee on her neck" with his full body weight. *Id.* at ¶ 28. She claims she was "repeatedly slammed to the ground, face down onto concrete, and dragged across the ground" and that "at no point did [Plaintiff] resist." *Id.* at ¶¶ 30-31.

Plaintiff alleges that Cpl. Casebolt's physical restraint caused "bodily injury to [Plaintiff's] neck, back and arm." *Id.* p. 5 ¶ 32. Plaintiff further alleges that she "continues to suffer and is in psychological distress." *Id.* p. 9 ¶ 32.

She admits that Corporal Casebolt at all times material hereto was acting in the scope of his employment as agent, servant, and employee of the City, specifically the MPD, and was performing a governmental function. *Id.* p. 12 ¶ 52.

Plaintiff claims that "Cpl. Casebolt's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the MPD in regards to the use of excessive force for which The City of McKinney and Chief Conley knew, or should have known, but never provided the requisite and proper training." *Id.* p. 12 ¶ 53. Plaintiff alleges that the "MPD has not implemented policies and procedures to address excessive force incidents involving youth" and "to address race-based policing." *Id.* p. 13 ¶¶ 57-58.

---

[1] Despite the Plaintiff's assertion in the *Amended Complaint* that she did not resist Cpl. Casebolt's attempts to detain her, the Youtube video included in *Casebolt's Appendix* to *Casebolt's Motion for Summary Judgment* (and subsequent reasserted motion) clearly indicates she resisted detention.

Plaintiff claims that the City of McKinney has delegated policy-making authority and the training of the McKinney Police Officers to the Chief Conley, giving him the responsibility for setting training, supervision and disciplinary policies and assuring that they are followed. "The Chief of Police (subject to the approval of the City Manager) is therefore the final decision-maker and policymaker for the customs, practices, policies, and procedures complained of herein." *Id*. at ¶ 35. She alleges that the City "has a record of not providing MPD officers with adequate training, supervision, and discipline which results in not preventing the use excessive [sic] force by [MPD] officers, especially as it relates to youthful offenders. MPD has no written policy regarding handling juvenile detainees/arrestees." *Id*. at ¶ 50.

Plaintiff further claims that "numerous other officers, including, and in addition to Casebolt, have been involved in various policy violations with little to no disciplinary action taken. The failure to train, supervise, and/or discipline has allowed constitutionally violations to persist." *Id*. at ¶ 37. Plaintiff alleges that Cpl. Casebolt was hired against the recommendation of his training officer, and that Cpl. Casebolt's conduct since starting employment "evidenced a pattern and practice of excessive force, particularly against black people." *Id*. at ¶¶ 38-39.

Plaintiff then alleges a series of prior policy violations by Casebolt and the City of McKinney. She alleges that Casebolt had been sued for excessive force over an incident in 2007[2]; that Casebolt was involved in a previous incident involving the beating of black man in handcuffs in 2009 and suspended for two weeks; that in 2010, Cpl. Casebolt left a S.W.A.T. training exercise in full uniform to bail his girlfriend out of jail, leading to suspension and dismissal from the S.W.A.T team; that in 2010, Casebolt responded to a fight between black

---

[2] Plaintiff cites to *Albert Brown v. Eric Casebolt, et al.*, 4:08-cv-00291-MHS-DDB (E.D. Texas – Sherman Division) (2008); however, this meritless lawsuit was voluntarily non-suited by the pro se plaintiff.

teenagers, engaged the boy and girl fighters, which led to another officer becoming permanently disabled; that in 2011, Casebolt was suspended without pay for allegedly "stalking" his ex-girlfriend; and that in 2014, Casebolt received a written reprimand for posting about official police business on social media. *Amended Complaint*, Doc. 50, pp. 10-11, ¶¶ 40-46.

Plaintiff then claims that the MPD Disciplinary Matrix "provides that if an officer commits one of [sic] more violations he/she should be subject to termination" and that Cpl. Casebolt had "numerous incidents and complaints about Casebolt's negative interactions with black citizens." *Id.* at ¶ 48.

Plaintiff recites that no reasonably competent official would have concluded that the actions of Corporal Casebolt would not violate Plaintiff's rights and that no reasonably prudent officer under similar circumstances could have believed that Corporal Casebolt's conduct was justified. *Id.* p. 13 ¶ 54.

## III.   IDENTIFICATION OF LIVE PLEADINGS AND ISSUES

### A.   CLAIMS & DEFENSES IN LIVE PLEADINGS

Plaintiff filed *Plaintiff's First Amended Complaint* (Plaintiff's live pleading) on May 23, 2017 (hereinafter, the *"Amended Complaint"*) (Doc. 50).   The *Amended Complaint* expressly identifies three claims under Federal law:

1.   Alleged excessive force in Corporal Casebolt's detention of Plaintiff in violation of the Fourth Amendment.   (*Amended Complaint*, Doc. 50 pp. 13–14 ¶¶ 59–64);

2.   Alleged violation of Plaintiff's Fourth Amendment rights by failing to train, supervise and/or discipline officers regarding the use of excessive force. (*Amended Complaint*, Doc. 50 pp. 14-18 ¶¶ 65-82); and

3.   Alleged false arrest in violation of the Fourth Amendment.   (*Amended Complaint*, Doc. 50 pp. 18–19 ¶¶ 83-87).

The *Amended Complaint* expressly identifies three claims under State law:

4.      Alleged Negligent hiring against the City (*Amended Complaint*, Doc. 50 p. 19 ¶¶ 88-90);

5.      Alleged Assault and Battery against Casebolt and the City[3] (*Amended Complaint*, Doc. 50 p. 19 ¶¶ 91–93); and

6.      Alleged Gross Negligence against Casebolt and the City (*Amended Complaint*, Doc. 50 pp. 19–21 ¶¶ 94–102).

7.      Alleged Intentional Infliction of Emotional Distress against Casebolt and the City (*Amended Complaint*, Doc. 50, p. 21 ¶¶ 103 – 109).

In its Answers and again by this document, McKinney asserts its Immunity Defenses. Plaintiff bears the pleading and evidentiary burdens to overcome each of these defenses. Plaintiff cannot satisfy either burden. Plaintiff's claims against McKinney fail because Plaintiff cannot show a violation of any federal or state law or right and/or Plaintiff cannot show a viable municipal liability claim under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 695 (1978). Consequently, Plaintiff's claims against McKinney should be dismissed with prejudice.

McKinney seeks dismissal based on Plaintiff's live pleading (Doc. 50) because the pleading fails to state an actionable claim under Federal Rule of Civil Procedure 12.  For the reasons discussed herein, the Court should dismiss Plaintiff's claims, in their entirety, with prejudice. Additionally, McKinney is entitled to summary judgment on all claims.

---

[3] In her Original Complaint (Doc. 1), Plaintiff included the City of McKinney her Texas state-law claims, but indicated in her *Response to McKinney's Motion for Summary Judgment* that she was dropping those claims. Doc. 41, p. 46. It is unclear whether the Amended Complaint includes the City in the state-law claims; therefore, McKinney addresses these claims again here in an abundance of caution (in the *Amended Complaint*, Plaintiff incorporates all prior paragraphs, and alleges Casebolt was acting within his course and scope of employment at all times).

B.  ISSUES TO BE DECIDED

In accordance with Local Rule CV-56(a), McKinney submits the following issues to the

Court for both its Motion to Dismiss and for its Motion for Summary Judgment:

Issue No. 1:    Whether the Plaintiff pleaded sufficient factual allegations of a "**policy**" under the *Monell* municipal liability framework to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6).

Issue No. 2:    Whether the Plaintiff pleaded sufficient factual allegations of a final "**policymaker**" under the *Monell* municipal liability framework to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6).

Issue No. 3:    Whether the Plaintiff pleaded sufficient factual allegations of a constitutional violation whose **moving force** is a policy or practice/custom under the *Monell* municipal liability framework to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6).

Issue No. 4:    Whether the Plaintiff pleaded sufficient factual allegations for a failure-to-train claim against McKinney to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6).

Issue No. 5:    Whether the Plaintiff pleads sufficient factual allegations to address McKinney's assertion of immunity as to the Texas State law claims to avoid their dismissal under Federal Rule of Civil Procedure 12(b)(6).

Issue No. 6:    Whether the Plaintiff pleads sufficient factual allegations to address McKinney's assertion of immunity as to all claims for exemplary/punitive damages to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6).

Issue No. 7:    Whether Plaintiff produces evidence raising a genuine issue of material fact as to the existence of a "**policy**" under the *Monell* municipal liability framework to avoid summary judgment under Federal Rule of Civil Procedure 56.

Issue No. 8:    Whether Plaintiff produces evidence raising a genuine issue of material fact as to the existence of a final "**policymaker**" under the *Monell* municipal liability framework to avoid summary judgment under Federal Rule of Civil Procedure 56.

Issue No. 9:     Whether Plaintiff produces evidence raising a genuine issue of material fact as to the existence of a **constitutional violation** to avoid summary judgment under Federal Rule of Civil Procedure 56.

Issue No. 10:    Whether Plaintiff produces evidence raising a genuine issue of material fact as to whether the **moving force** of Plaintiff's alleged injuries is a policy or practice/custom under the *Monell* municipal liability framework to avoid summary judgment under Federal Rule of Civil Procedure 56.

Issue No. 11:    Whether Plaintiff produces evidence raising a genuine issue of material fact as to each and every element of a failure-to-train claim against McKinney to avoid summary judgment under Federal Rule of Civil Procedure 56.

Issue No. 12:    Whether the Plaintiff produces evidence raising a genuine issue of material fact as to McKinney's assertion of immunity as to the Texas State-law claims to avoid summary judgment under Federal Rule of Civil Procedure 56.

Issue No. 13:    Whether the Plaintiff produces evidence raising a genuine issue of material fact as to McKinney's assertion of immunity for all claims seeking exemplary/punitive damages to avoid summary judgment under Federal Rule of Civil Procedure 56.

## IV.   STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule CV-56(a), McKinney provides this Statement of Undisputed Material Facts. To avoid duplicative filings, McKinney fully incorporates and relies upon Cpl. Casebolt's Appendix (hereinafter the "Casebolt Appendix") to Casebolt's Motion for Summary Judgment (and Casebolt's Reasserted Motion for Summary Judgment, Doc. 53) in its entirety. As Casebolt outlines in his motion, the Casebolt Appendix includes a video recording from Cpl. Casebolt's Police car's dash camera (hereinafter "Casebolt Dashcam"). The Casebolt Appendix also includes a bystander's cellphone video which was eventually posted on the content sharing website YouTube and referenced hereinafter as the "YouTube Video." In incorporating the

Casebolt Appendix in its entirety, McKinney aligns its Undisputed Facts as nearly as possible

with Cpl. Casebolt's, citing to them as "U.F." followed by the pertinent number.

**Undisputed Fact No. 1:**      At the time of the incident, Cpl. Casebolt had worked as a Police
Officer for MPD for about 10 years. Prior to that, he worked as a State Trooper for the Texas
Department of Public Safety, and before that he served in the United States Navy for 10 years,
with the last three years of service in the Navy as a Military Law Enforcement Officer. He left
the Navy with a voluntary honorable discharge. (Casebolt Dec., Casebolt Apx. p. 2 ¶ 3).

**Undisputed Fact No. 2:**      Prior to becoming a civilian Law Enforcement Officer, Cpl.
Casebolt completed a Basic Police Officer Training Academy course approved by the Texas
Commission on Law Enforcement Officer Standards and Education ("TCLEOSE"). TCLEOSE
is the State of Texas agency which is now known as the Texas Commission on Law Enforcement
("TCOLE"). Cpl. Casebolt's TCLEOSE/TCOLE approved Police Academy training consisted of
about six and a half months of instruction. The Basic Police Academy included instruction
regarding a Police Officer's lawful use of force, lawful detentions, and lawful arrests. Prior to
serving as a DPS State Trooper, Cpl. Casebolt completed a Field Training program working
under several TCOLE approved Field Training Officers. Cpl. Casebolt received refresher
materials at each stage of his training regarding lawful use of force, lawful arrests and detentions
and seizures, and other Police matters. (Casebolt Dec., Casebolt Apx. p. 3 ¶ 4).

**Undisputed Fact No. 3:**      Throughout his time as a Texas Police Officer, Cpl. Casebolt
completed all TCOLE-required ongoing Law Enforcement Officer training, consisting of a
minimum of forty (40) hours of continuing education during each two-year span. This continuing
education included refresher materials from time to time regarding lawful use of force, lawful
seizures, detentions and arrests. (Casebolt Dec., Casebolt Apx. p. 3 ¶ 4).

**Undisputed Fact No. 4:**      On the day of the incident, Casebolt was dressed in a dark blue
Police Officer uniform with badges and insignia and equipment which in combination made him
immediately recognizable as a Police Officer. His vehicle was an immediately recognized
marked Police vehicle (Casebolt Dec., Casebolt Apx. p. 3 ¶ 5).

**Undisputed Fact No. 5:**      On June 5, 2015, the McKinney Police Department ("MPD")
began receiving calls from a number of people reporting a disturbance and fighting at a private
pool and private park owned by a Homeowner's Association in the Craig Ranch neighborhood.
The initial reports indicated that the management and security guard were unable to control a
large crowd which contained multiple juveniles who did not live in the area and who had been
asked to leave the private property, but refused to leave (Casebolt Dec., Apx. pp. 3-4 ¶¶ 6-8; and
MPD Communication Notes, Casebolt Apx. p. 16).

**Undisputed Fact No. 6:**      The complainants also reported that a large number of people were
climbing or jumping a fence to get into a swimming pool area. The initial reports indicated that
there was fighting going on and people were throwing things at people or cars (Casebolt Dec.,
Casebolt Apx. p. 4 ¶ 8; and MPD Communication Notes, Casebolt Apx. p. 16).

**Undisputed Fact No. 7:**      When Casebolt first arrived in the neighborhood near the pool, he could see large numbers of teenagers or young adults randomly moving in different directions with some moving toward the pool and others moving away from the pool area, and others in groups near the pool area (Casebolt Dashcam, counter 5:00-5:29).

**Undisputed Fact No. 8:**      Casebolt could see a crowd of teenagers or young adults inside the fenced area surrounding the private pool – as many as 60, mostly males, inside that area (Casebolt Dec., Apx. p. 4 ¶ 9) (Casebolt Dashcam counter 5:00-5:08).

**Undisputed Fact No. 9:**      Cpl. Casebolt saw a uniformed security guard who appeared to have been in a fight because his clothing was disheveled and shirt was partially untucked (Casebolt Dashcam counter 5:00-5:08; Casebolt Dec., Casebolt Apx. p. 4 ¶ 10).

**Undisputed Fact No. 10:**      Casebolt made several requests for someone to tell him where the fighting was going on. An adult male pointed toward the pool. An adult female pointed toward the small private park adjacent to the pool (Casebolt Dec., Casebolt Apx. p. 4 ¶ 10; Casebolt Dashcam counter 5:00-5:08).

**Undisputed Fact No. 11:**      Although it cannot be seen on camera, a number of males that had been inside the pool fenced area climbed or jumped over the fence and began running away from Cpl. Casebolt (Casebolt Dec., Casebolt Apx. p. 4 ¶ 11).

**Undisputed Fact No. 12:**      Cpl. Casebolt thought that there may be fighting inside the pool area and that people were trying to get away from him because he was a Police Officer in a marked Police car. Some of the people Casebolt had seen climbing over the fence can be seen on his dashcam (Casebolt Dashcam counter 5:25-5:32; Casebolt Dec., Casebolt Apx. p. 4 ¶ 11).

**Undisputed Fact No. 13:**      Members of the crowd, the same males that Casebolt had seen climbing over the fence, were trying to leave the area and Cpl. Casebolt ordered these males to get on the ground because he wanted to investigate their actions. Some of the males that Casebolt ordered to get on the ground did not obey his orders. At least one walked around a corner and did not return. (Casebolt Dec., Casebolt Apx. p. 4 ¶¶ 11-12; Casebolt Dashcam counter 5:40).

**Undisputed Fact No. 14:**      Cpl. Casebolt had seen about 100 young people in the area of the pool and park. He was trying to determine if any fighting was going on, he also wanted to keep the crowd from returning to the pool or park area because those were the center of the reported fighting or disturbances. Up to that point, Cpl. Casebolt was the only Police Officer on the scene (Casebolt Dec., Casebolt Apx. p. 4 ¶¶ 11-12).

**Undisputed Fact No. 15:**      Cpl. Casebolt orders some of the males who had been jumping over the fence to come back to him. He yelled "Hey, get over here!", and a number of the young males in that group began to run away (Casebolt Dec., Casebolt Apx. p. 5 ¶ 13; Casebolt Dashcam counter 5:30-5:50).

**Undisputed Fact No. 16:**      Cpl. Casebolt thought that some of the males who were running away were trying to draw him away from the area of the pool. Some of those persons flipped him off. One of the males trotted a distance away and turned and watched Cpl. Casebolt in a way that

made Cpl. Casebolt think this person was trying to draw Cpl. Casebolt away from the pool area (Casebolt Dec., Casebolt Apx. p. 5 ¶ 13).

**Undisputed Fact No. 17:**     At this time, Cpl. Casebolt was trying to keep the males he had seen jumping over the fence detained and he was also trying to order people to leave if he had not seen them running or otherwise acting suspiciously. Despite this, a large number of people in the crowd were not leaving (Casebolt Dec., Casebolt Apx. p. 5 ¶ 14; Casebolt Dashcam counter 5:50-7:29).

**Undisputed Fact No. 18:**     While all of this was going on, Cpl. Casebolt could hear a lot of yelling, mostly female voices, and this added to the confusion and distracted him from trying to find out what was going on in the area of the park and the pool entrance (Casebolt Dec., Casebolt Apx. p. 5 ¶ 15; Casebolt Dashcam counter 8:00-8:14).

**Undisputed Fact No. 19:**     Cpl. Casebolt had received reports from MPD Communications that there had been a fight involving three juvenile individuals fighting an older adult female and one of the people involved in the fight was a black female wearing a bikini with an orange top (Casebolt Dec., Casebolt Apx. p. 5 ¶ 15; MPD Communication Notes, Casebolt Apx. p. 16).

**Undisputed Fact No. 20:**     Plaintiff D.B. was wearing a bikini which had an orangish colored top. D.B. is the female seen in videos in a multi-colored bikini with an orangish colored top (Casebolt Dashcam counter 7:05-7:13; YouTube Video counter 1:21-1:27).

**Undisputed Fact No. 21:**     Cpl. Casebolt did not notice any other black female juvenile in a bikini with an orange or orangish top besides D.B. D.B.'s actions before Cpl. Casebolt even approached her made Cpl. Casebolt think that D.B. could be one of the instigators of disturbances or fighting (Casebolt Dec., Casebolt Apx. p. 6).

**Undisputed Fact No. 22:**     Cpl. Casebolt told the group of girls shown in the video, including D.B., to "get your ass out of here" at the same time he was handcuffing two males (YouTube Video counter 1:11-1:18). Cpl. Casebolt gave at least 2 more orders to D.B. and the group of girls to leave. (YouTube Video counter 2:26-2:28 & 2:35).

**Undisputed Fact No. 23:**     Several seconds after Cpl. Casebolt ordered her to leave, D.B. walked right past Cpl. Casebolt immediately adjacent to where he was trying to carry out the handcuffing of two males and D.B. then walked out into the street and stopped right past where Cpl. Casebolt was handcuffing the two males (YouTube Video counter 1:21-1:27).

**Undisputed Fact No. 24:**     D.B. then rejoined a group of girls in bathing suits and the group appeared to be walking away after Cpl. Casebolt again ordered D.B. to leave. Cpl. Casebolt thought D.B. had actually left – finally complying with the order to leave he had repeated several times. D.B. can be seen turning back and talking/shouting something towards Casebolt's direction (Casebolt Dec., Casebolt Apx. p. 6 ¶¶ 18-19; YouTube Video counter 2:28-2:50).

**Undisputed Fact No. 25:**     Even though D.B. had appeared to leave and Cpl. Casebolt thought she was leaving, D.B. then defied Casebolt's earlier orders by reappearing in Cpl. Casebolt's

view and began walking back toward Cpl. Casebolt instead of leaving (YouTube Video counter 2:52; Casebolt Dec., Casebolt Apx. p. 6 ¶¶ 19-20).

**Undisputed Fact No. 26:**     At this point, Cpl. Casebolt thought D.B. had interfered with performance of his duties as a public servant which would be a violation of Texas Penal Code § 38.15. Cpl. Casebolt also thought D.B. may have been one of the people involved in the fight or involved in instigating disturbances because she had repeatedly disobeyed or ignored Casebolt's orders. Cpl. Casebolt did not want D.B. to return to the area where he had handcuffed the two males. He was concerned that D.B. might stir up additional disturbances or interfere in his efforts to investigate what was going on or interfere in efforts to maintain control and order. At that point, Cpl. Casebolt did not see any other Officer near enough to assist him (Casebolt Dec., Casebolt Apx. p. 6 ¶ 20).

**Undisputed Fact No. 27:**     Cpl. Casebolt approached D.B., grasped her arm and began walking her back along a sidewalk area. D.B. pulled away from Cpl. Casebolt and as she was pulling away from him, she turned in a circle away from Cpl. Casebolt as he was holding her arm. Cpl. Casebolt then used an armbar technique to place her on the grass (Casebolt Dec., Casebolt Apx. p. 7 ¶ 21; YouTube Video counter 3:00-3:03).

**Undisputed Fact No. 28:**     D.B. continued to resist Cpl. Casebolt's efforts to control her and tried to get up from the grass (Casebolt Dec., Casebolt Apx. p. 7 ¶¶ 21-22; YouTube Video counter 3:05).

**Undisputed Fact No. 29:**     Cpl. Casebolt again used an armbar control technique pushing D.B. back onto the grass, but this time she landed partly on the sidewalk and partly on the grass (Casebolt Dec., Casebolt Apx. p. 7 ¶ 22; YouTube Video counter 3:05-3:06).

**Undisputed Fact No. 30:**     While Cpl. Casebolt was trying to hold D.B. down, she was trying to push herself back up and at the same time, people rushed toward Cpl. Casebolt. A female in a white bikini came so close to Cpl. Casebolt that he pushed her away. A male teenager or young adult rushed Cpl. Casebolt and squatted in a football stance or wrestling stance immediately adjacent to Cpl. Casebolt. Another young male rushed toward Cpl. Casebolt but did not get as close as the male who had squatted (Casebolt Dec., Casebolt Apx. p. 7 ¶¶ 22-23; YouTube Video counter 3:09-3:12).

**Undisputed Fact No. 31:**     Cpl. Casebolt stood up and unholstered his service pistol pointing it in a downward direction. The two males who had rushed him ran away. Cpl. Casebolt reholstered his service handgun after several seconds. He had never pointed it at D.B. (Casebolt Dec., Casebolt Apx. p. 7 ¶ 23; YouTube Video counter 3:19-3:21).

**Undisputed Fact No. 32:**     Cpl. Casebolt then began to attempt to move D.B. by standing her up. He had the intention of placing her near the other people who were detained in handcuffs (Casebolt Dec., Casebolt Apx. p. 7 ¶ 23).

**Undisputed Fact No. 33:**      D.B. would not stand up and her body was loose or limp which caused her to pull away or fall away from Cpl. Casebolt and this caused her to be placed back on the grass (YouTube Video counter 3:22-3:25; Casebolt Dec., Casebolt Apx. p. 7 ¶ 23).

**Undisputed Fact No. 34:**      When D.B. was back on the grass, she continued to struggle with Cpl. Casebolt. He tried to move her away from the fence area where Cpl. Casebolt thought he would be less vulnerable (Casebolt Dec., Casebolt Apx. p. 7 ¶ 23; YouTube Video counter 3:21-3:50).

**Undisputed Fact No. 35:**      During this, D.B. resisted by lying on her side and disregarding Cpl Casebolt's orders to get on her face or lay face down, and she was generally trying to push herself off the ground and pull away from him. Part of this struggle can be seen on video (YouTube Video counter 3:21-3:50; Casebolt Dec., Casebolt Apx. p. 7 ¶ 24).

**Undisputed Fact No. 36:**      Cpl. Casebolt was concerned about where he could place his hands on D.B. because she was a female in a bikini and he therefore felt limited on where he would put his hands on her body to control her. He therefore primarily used his hands to make contact with her arm or shoulder or head or neck area (Casebolt Dec., Casebolt Apx. p. 9 ¶ 30; YouTube Video counter 3:21-4:00).

**Undisputed Fact No. 37:**      Cpl. Casebolt had used his two sets of handcuffs on the two males that he had handcuffed shortly before his encounter (Casebolt Dec., Casebolt Apx. p. 7 ¶ 25; YouTube Video counter 1:11-1:27). For these reasons, and because D.B. was wearing a bikini, when Cpl. Casebolt was trying to maintain control over D.B. without handcuffs available, at first he placed both knees on D.B.'s back – for about 9 seconds both of his knees were on her back (YouTube Video counter 3:50-3:59; Casebolt Dec., Casebolt Apx. p. 7 ¶ 25 and p. 9 ¶ 30).

**Undisputed Fact No. 38:**      When D.B. stopped struggling as much, Cpl. Casebolt moved one of his legs off her back but keeping one leg on or over her back (Casebolt Dec., Casebolt Apx. pp. 7-8 ¶ 25; YouTube Video counter 3:59-4:01).

**Undisputed Fact No. 39:**      D.B. was crying. At one point, Cpl. Casebolt told D.B. "You're going to jail if you don't knock it off." (YouTube Video counter 5:12). Shortly after this, D.B. calmed down and Cpl. Casebolt removed his right knee from her and kneeled next to her. None of Cpl. Casebolt's knees were on D.B. after this. (Casebolt Dec., Casebolt Apx. p. 8 ¶¶ 25-26; YouTube Video counter 5:23-5:24).

**Undisputed Fact No. 40:**      Cpl. Casebolt directed D.B. to put her hands on her lower back because he still did not have handcuffs. At this point, D.B. complied with the direction (Casebolt Dec., Casebolt Apx. p. 8 ¶ 26; YouTube Video counter 5:27). D.B. generally kept her hands in this position until she was handcuffed about one minute later by another Officer (Casebolt Dec., Casebolt Apx. p. 8 ¶ 26; YouTube Video counter 6:23).

**Undisputed Fact No. 41:**      After D.B. was handcuffed, she was moved from the ground to a seated position and then to a low stone wall where she was allowed to sit upright in a more

comfortable position. (This is not captured on video.) (Casebolt Dec., Casebolt Apx. p. 8 ¶¶ 26-27).

**Undisputed Fact No. 42:**     At that point, Cpl. Casebolt attended to other duties while another Officer – his supervisor Sgt. Shanley – watched over D.B. (Casebolt Dec., Casebolt Apx. p. 8 ¶ 27). (See generally Casebolt Dashcam counter 13:38-end.)

**Undisputed Fact No. 43:**     Cpl. Casebolt was having trouble breathing. The combination of a hot day, his physical exertions, his heavy equipment including a bullet-resistant vest, caused him to have difficulty breathing. He went to an ambulance about 22 minutes after he first arrived on the scene (Casebolt Dec., Casebolt Apx. p. 8 ¶¶ 27-28; Casebolt Dashcam counter 27:00-27:10).

**Undisputed Fact No. 43:**     In the ambulance, he was given treatment including intravenous fluids, connection to a heart monitor, and other examination. Because he had an elevated heart rate and felt dizzy, he was eventually transported to a hospital after spending over an hour in the ambulance at the scene (Casebolt Dec., Casebolt Apx. p. 8 ¶ 28).

**Undisputed Fact No. 44:**     Cpl. Casebolt estimates that he went to the paramedics in the ambulance for assistance about 20-30 minutes after he had first arrived on the scene. His dashcam has audio recordings capturing his difficulty breathing (Casebolt Dashcam counter 7:10-27:10). Casebolt told one of the Officers that he was going to get some air (Casebolt Dashcam counter 27:10). This would be at about the point Casebolt has estimated that he went to the ambulance since he arrived on the scene at Casebolt Dashcam counter 5:00, and this took place at Casebolt Dashcam counter 27:10 – about 22 minutes later.

**Undisputed Fact No. 45:**     While Cpl. Casebolt was in the ambulance at the scene and before he was taken from the scene, his supervisor spoke to Casebolt about releasing D.B., and she was released at about that time. D.B.'s release was handled by other Officers (Casebolt Dec., Casebolt Apx. p. 8 ¶ 27).

**Undisputed Fact No. 46:**     D.B. was allowed to leave the scene with an adult relative – Cpl. Casebolt thought it was D.B.'s grandmother or mother. This was less than an hour after D.B. was first handcuffed (Casebolt Dec., Casebolt Apx. p. 8 ¶ 27).


## V.     LEGAL STANDARDS FOR DISMISSAL AND SUMMARY JUDGMENT

### A.  STANDARD FOR DISMISSAL UNDER RULE 12(B)(6)

McKinney moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motion. Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. Rule 12(b)(6)

provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted.  *Id*.  The Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff.  *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

Federal Rule of Civil Procedure 8(a) requires a plaintiff's pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The claim must include enough factual allegations "to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (2009) (citing *Twombly*, 550 U.S. 544, 555 (2007)).

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Gonzalez*, 577 F.3d at 603.  "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'"  *Id*.

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion.  First, the Court identifies and disregards conclusory allegations because they are "not entitled to the assumption of truth."  *Iqbal*, 556 U.S.

at 680.  Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief."  *Id*.  "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements."  *Morgan v. Hubert*, 335 F. App'x. 466, 470 (5th Cir. 2009).  This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

### B.  STANDARD FOR A TRADITIONAL MOTION FOR SUMMARY JUDGMENT

According to Federal Rule of Civil Procedure 56(a), the Court must grant summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Epps v. NCNB Nat'l Bank*, 838 F. Supp. 296, 298-99 (N.D. Tex. 1993), *aff'd*, 7 F.3d 44 (5th Cir. 1993).  A material fact is one that relates to the dispute such that it could affect the outcome under the governing body of substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For a fact issue to be genuine, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id*. Consequently, to defeat a motion for summary judgment, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party bears the burden of coming forward with "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

### C.  STANDARD FOR A NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

On a Rule 56 no-evidence motion for summary judgment, the moving party bears no burden "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Rather, the movant satisfies its burden by pointing out that "there is an absence of evidence to support the nonmoving party's case." *Id*.  In turn, the Court must grant summary judgment if the nonmovant fails to establish the existence of an element essential to the nonmovant's case on which it bears the burden of proof at trial.  *Hernandez v. Igloo Prod. Corp. Retirement Plan*, 868 F. Supp. 200, 204 (S.D. Tex. 1994).

Unsupported allegations asserting conclusory facts and conclusions of law are not sufficient to defeat a motion for summary judgment.  *Duffy v. Leading Edge Products, Inc*., 44 F.3d 308, 312 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 247).  Therefore, the nonmovant must support its opposition to a summary judgment motion with "specific, non-conclusory affidavits or other competent summary judgment evidence."  *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991).  The Court must inquire into both the genuineness and materiality of any claimed factual disputes.  *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993).  Differing versions of the same facts do not necessarily create a genuine issue of material fact to defeat summary judgment. *Fraire v. City of Arlington*, 957 F.2d 1268, 1270 (5th Cir. 1992). A factual dispute is not material unless it is relevant and necessary to the outcome of the suit. *Wiley v. State Farm Fire and Cas. Co*., 585 F.3d 206, 210 (5th Cir. 2009). If the nonmovant fails to establish the existence of an

element essential to the nonmovant's case on which it bears the burden of proof at trial, the Court must grant summary judgment. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005).

## VI.     CLAIMS SUBJECT TO RULE 12(b)(6) DISMISSAL

### A.  FAILURE OF MUNICIPAL LIABILITY CLAIMS AGAINST MCKINNEY (ISSUE NOS. 1-3)

#### 1.  PLAINTIFF FAILS TO PLEAD BASIC FACTS

Plaintiff claims that McKinney is liable under 42 U.S.C. § 1983 for alleged constitutional violations of excessive force, failure to train, and false arrest. Plaintiff expressly states that Cpl. Casebolt was at all times acting in the scope of his employment as agent, servant and employee of the City. *Amended Complaint*, Doc. 50 p. 12 ¶ 52. However, it is well settled that "a municipality may not be held liable under Section 1983 on the basis of *respondeat superior*." *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 308–309 (5th Cir. 2004) (citing *Monell*, 436 U.S. at 691).  Rather, a municipality is liable under § 1983 only when an injury is caused by the execution of the government's policy or practice/custom. *Monell*, 436 U.S. at 694.

To establish the liability of a municipality, Plaintiff bears the burden of pleading and proving the existence of: (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or practice/custom.  *Monell*, 436 U.S. at 691; *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012).  To establish the third element, Plaintiff may show "either (1) that the policy itself violated federal law, or authorized or directed the deprivation of federal rights; or (2) that the policy was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious

consequences" by way of at "least a pattern of similar violations."  *Johnson*, 379 F.3d at 309 (citing *Board of County Commissioners of Bryan County. v. Brown*, 520 U.S. 397 (1997)).   A showing of simple or even heightened negligence will not suffice; the alleged policy inadequacies must amount to an intentional choice on the part of the policymaker.  *Colle v. Brazos County*, 981 F.2d 237, 245-46 (5th Cir. 1993).

"The description of a policy or practice/custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts."  *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997); *see also G.M. v. Shelton*, 595 F. App'x. 262, 265 (5th Cir. 2014).   Further, the policy must be "the city government's policy and not the policy of an individual official."  *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984); *see also Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Despite *Monell*'s express rejection of vicarious municipal liability, Plaintiff attempts to hold McKinney vicariously liable for Cpl. Casebolt's alleged improper conduct and/or Plaintiff's alleged injuries.  In conclusory fashion, Plaintiff complains that McKinney lacked policies or failed to train its officers (including Corporal Casebolt) on policies designed to prevent the alleged injuries, and that this alleged failure resulted in Plaintiff's alleged injuries. *E.g., Amended Complaint*, Doc. 50, pp. 9-10 ¶¶ 35-37.  Likewise, Plaintiff assigns responsibility for developing the alleged unnamed policies to McKinney's Chief of Police and City Council. *Amended Complaint*, Doc. 50, p. 15  ¶ 68.  Simply put, Plaintiff has not pleaded facts identifying any unconstitutional policy or practice of McKinney or its Police Officers.  Plaintiff has not pleaded facts establishing that a McKinney final policymaker exhibited deliberate indifference by implementing an unconstitutional policy or practice/custom that caused the alleged injury.  *See*

*Bennett*, 728 F.2d at 769.   Because Plaintiff improperly seeks to hold McKinney vicariously liable, these § 1983 claims must be dismissed.   *Iqbal*, 556 U.S. at 679–80.

### 2.   PLAINTIFF FAILS TO PLEAD A POLICY AND POLICYMAKER

Further, Plaintiff's conclusory allegations regarding McKinney policy and policymakers are insufficient to withstand dismissal under Rule 12(b)(6). *See Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005).   Plaintiff's *Amended Complaint* is devoid of any factual "description of a policy or practice/custom and its relationship to the underlying constitutional violation." *Spiller*, 130 F.3d at 167.   Plaintiff's only allegations regarding McKinney's alleged policymakers are general references that McKinney's "Chief of Police (Greg Conley) has immediate direction and control of the Police Department, subject to the supervision of the City Manager (Paul Grimes)" and that the "Chief of Police shall promulgate all orders, rules, and regulations governing the conduct of the Police Department, which, when approved by the City Manager… shall constitute the rules of the administration and conduct of the Department." Plaintiff further avers that the "Chief of Police, (subject to the approval of the City Manager) is the decisionmaker and policymaker for the customs, practices and procedures complained of […]" *Amended Complaint*, Doc. 50, pp. 1-2 ¶¶ 2-3.

However, an employee of a municipality is not a policymaker unless the municipality's authorized policymakers have delegated policymaking authority to the employee such that his decisions are not subject to review.   *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *see also Peterson v. City of Fort Worth*, 588 F.3d 838, 847–48 (5th Cir. 2009).   Consequently, "[t]he fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986); *see also Bolton v. City of Dallas*, 541 F.3d 545, 549 (5th Cir. 2008).

Plaintiff attempts to identify two potential policymakers, but fails to show any connection between the policymaker and an alleged policy.   Rather, Plaintiff merely alleges in broad, conclusory fashion that the McKinney's unnamed policies/practices or failure to institute such unnamed policies/practice, combined with an alleged failure to train/discipline officers, exhibited "deliberate indifference" to Plaintiff's constitutional rights. *Amended Complaint*, Doc. 50 p. 15 ¶¶ 67-69.  Plaintiff recites en masse the rule for policies and policymakers under a *Monell* claim in lieu of pleading specific facts that would support her "policy" claims. The vast majority of her recitations allege only a failure to train/discipline:

1. "[…] there exists a custom/unwritten policy of lack of training, supervision, and discipline regarding excessive force incidents which result violations of constitutional rights by MPD officers" (*Id.*, Doc 50 p. 10 ¶ 36);

2. "[…] numerous other officers, including, and in addition to Casebolt, have been involved in various policy violations with little to no disciplinary action taken.  The failure to train, supervise, and/or discipline has allowed constitutional violations to persist." (*Id.*, Doc 50 p. 10 ¶ 37);

3. "MPD's continued retention of Casebolt in light of his repeated policy violations […] demonstrate a custom/policy of failure to properly discipline, and of deliberate indifference to his ongoing practice of violating constitutional rights of people he interacted with, and particularly black people." (*Id.*, Doc 50 p. 12 ¶ 49);

4. "The City of McKinney has a record of not providing MPD officers with adequate training, supervision, and discipline […] MPD has no written policy regarding handling juvenile detainees/arrestees." (*Id.*, Doc 50 p. 12 ¶ 50);

5. "[…] MPD officers are not provided with adequate training regarding the use of force, especially against children." (*Id.*, Doc 50 p. 12 ¶ 51);

6. "[…] wrongful and reckless customs, policies, practices and/or procedures of the MPD in regards to the use of excessive force for which The City of McKinney and Chief Conley knew, or should have known, but never provided the requisite and proper training." (*Id.*, Doc 50 p. 12 ¶ 53);

7. "[…] MPD has not implemented policies and procedures to address excessive force incidents involving youth." (*Id.*, Doc 50 p. 13 ¶ 57);

8. "[…] MPD has not implemented policies and procedures to address race-based policing." (*Id.*, Doc 50 p. 13 ¶ 58);

9. "[…Cpl. Casebolt] followed a procedure designed to inflict excessive force in restraining a minor child in a non-life threatening situation" (*Id.*, Doc 50 p. 14 ¶ 62);

10. "[… Cpl.] Casebolt was acting within the custom, policy, practice and/or procedures of the MPD in regards to the use of excessive force as authorized and/or ratified by Chief Greg Conley at the time of the incident."(*Id.*, Doc 50 p. 14 ¶ 63);

11. "[…] acting pursuant to customs, practices and policies of The City of McKinney and the MPD in regards to the use of excessive force […]" (*Id.*, Doc 50 p. 15 ¶ 66);

12. "By failing to provide proper training in the use of excessive force, the MPD and Chief Conley exhibited deliberate indifference in failing to train to an obvious need for training of which they were on notice […]" (*Id.*, Doc 50 p. 15 ¶ 67);

13. "[…] The City of McKinney and the MPD failed to adequately train its employees regarding the use of excessive force. This failure to train its employees in a relevant respect reflects a deliberate indifference to The City of McKinney, the McKinney City Council, MPD and Chief Conley to the rights of the city's inhabitants […]." (*Id.*, Doc 50 p. 15 ¶ 68);

14. "McKinney developed and maintained a policy of deficient training of its police force in the use of force, including the use of excessive force in the apprehension of youthful individuals." (*Id.*, Doc 50 p. 15 ¶ 69);

15. "[…] McKinney does not have any policies nor provide any training regarding use of force against children […]."  (*Id.*, Doc 50 p. 15 ¶ 70);

16. "McKinney's failure to adequately train regarding the use of excessive force against children […]."  (*Id.*, Doc 50 p. 16 ¶ 73);

17. "McKinney knew or should have known that failure to adequately train would result in use of excessive force against children […]."(*Id.*, Doc 50 p. 16 ¶ 76);

18. "The City of McKinney and the MPD's failure to provide adequate training to its police officers regarding the use of excessive force reflects deliberate indifference […]." (*Id.*, Doc 50 p. 16 ¶ 77);

19. "[Cpl.] Casebolt's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which McKinney knew or should have known that conduct such as evidence in the instant case was likely to occur, but never provided the requisite and proper training that would have prevented it." (*Id.*, Doc 50 p. 17 ¶ 78);

20. "[…] McKinney, acting through official and unwritten policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of D.B. failed to implement the policies, procedures; and practices necessary to provide constitutionally adequate protection to D.B. and implemented policies, procedures, and practices which were the moving force behind the violation of her constitutional rights." (*Id.*, Doc 50 p. 17 ¶ 79);

21. "[…] the following conduct, policies, and customs, inter alia, by Defendants violated D.B.'s constitutional rights:

    a. […] failure to adequately train or discipline its officers, including Casebolt;

    b. MPD's failure to discipline or terminate Casebolt and other officers for non-compliance with policy;

    c. MPD's policy on the use of force fails to address use of force against minor children;

d.  Failing to discipline, and if necessary, terminate officers with emotional problems based on prior violations"  (*Id.*, Doc 50 p. 17 ¶ 80);

22. "[…] Chief Conley failed and refused to implement customs, policies, practices or procedures, and failed to train its personnel adequately on the appropriate policies, practices or procedures regarding the use of excessive force or detaining youth." (*Id.*, Doc 50 pp. 17-18 ¶ 81);

23. "The City of McKinney's failure to properly train its police officers regarding the use of force […]."(*Id.*, Doc 50 p. 18 ¶ 82);

24. "[…] Defendant Casebolt was acting within the official customs, policies, practices and/or procedures in regards to the use of excessive force […]" (*Id.*, Doc 50 p. 18 ¶ 85);

Plaintiff's repetitious conclusions regarding the alleged "policy" do not bootstrap her unsupported assertions into factual reality. The *Amended Complaint* must contain more than these formulaic incantations about policies; "[…] it must contain specific facts […]" that "[describe] a policy or practice/custom and its relationship to the underlying constitutional violation." *Spiller*, 130 F.3d at 167. Indeed, Plaintiff has not, and cannot, identify any specific policy or practice/custom that caused a civil rights violation. Plaintiff's broad, conclusory, and formulaic allegations absent any factual specificity are simply inadequate to sustain a claim against McKinney, and all such claims must be dismissed.  *Iqbal*, 556 U.S. at 679-81.

McKinney shows that **Issue No. 1, Issue No. 2, and Issue No. 3** are resolved in the negative: Plaintiff has not pleaded sufficient allegations under the *Monell* municipal liability framework to avoid dismissal under Federal Rule of Civil Procedure 12(b)(6).

## B.  PLAINTIFF FAILS TO ADEQUATELY PLEAD A FAILURE-TO-TRAIN CLAIM (ISSUE NO. 4)

In her *Amended Complaint*, Plaintiff relies heavily on a conclusory failure-to-train claim against McKinney, again failing to adequately plead a cause of action. Plaintiff asserts that a policy underlying her *Monell* claim for municipal liability is under a "failure-to-train" or "failure-to-discipline" theory. *See Amended Complaint*, Doc. 50, p. 14 ¶ 65. When a policy underlying a municipal liability claim under 42 U.S.C. § 1983 is not itself unconstitutional, such as when a plaintiff contends that a governmental entity has engaged in inadequate training or supervision, there is some question as to whether such an allegation can ever meet the "policy" requirement of *Monell*. *See Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985). In such a situation, "considerably more proof" will be needed to establish both municipal "fault" and causation between the "policy" and constitutional deprivation. *Id*. at 824.

In *City of Canton v. Harris*, the United States Supreme Court established definitive standards for imposing municipal liability for inadequate training. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). These require a claimant to identify a specific training deficiency, establish that this deficiency was the result of deliberate indifference to the Constitutional rights of the public, and show that the alleged training deficiency was the proximate cause of the violation of Constitutional rights at issue. *City of Canton*, 489 U.S. 378; *Roberts v. Prator*, 397 F.3d 287, 292-94 (5th Cir. 2005); *see also Tuttle*, 471 U.S. at 828; *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998).

In summary, to state a claim for inadequate training, Plaintiff in this case must: (1) identify specific training that was inadequate; (2) establish this lack of training proximately caused the alleged injury to D.B.; and (3) prove any alleged inadequate training was the result of deliberate indifference by McKinney policymakers to the Constitutional rights of citizens. *Pineda v. City of Houston*, 291 F.3d 325, 331-32 (5th Cir. 2002); *Cozzo v. Tangipahoa Parish Council-President Government, et al.*, 279 F.3d 273, 286 (5th Cir. 2002); *Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000); *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).

The Fifth Circuit has directly addressed § 1983 claims based upon "inadequate" policies or decisions by a policymaker, such as claims of inadequate supervision, discipline, hiring, etc. Citing *City of Canton* for the proposition that "proof of an inadequate policy, without more, is insufficient to meet the threshold requirements of § 1983," the Court has held that policies which do not actually *direct* a Constitutional violation, but are alleged to be inadequate or deficient, are only actionable under § 1983 "upon a showing that they were enacted or made with *deliberate indifference* to their possible unconstitutional consequences." *Gonzales v. Ysleta Independent School District*, 996 F.2d 745, 757, 759 (5th Cir. 1993) (emphasis added).

### 1. PLAINTIFF FAILS TO IDENTIFY SPECIFIC TRAINING ALLEGEDLY CAUSING PLAINTIFF'S INJURIES.

Plaintiff fails to assert any *factual* allegations to identify a specific training that was inadequate. Her numerous conclusory allegations identify only a broad, vague failure on McKinney's part. The allegations tend to follow a formula that resembles the following: "McKinney failed to train/supervise/discipline its officers regarding [general facts from Plaintiff's detention] and/or [characteristics of Plaintiff]. *See Amended Complaint*, Doc. 50, pp.

12-18, ¶¶ 49-51, 57-58, 62, 69-70, 73, 76, 80-81. No factual allegations narrow Plaintiff's general failure-to-train allegations. Theoretically, any plaintiff could allege a failure-to-train claim using this formula—this simply cannot meet the standard. The United States Supreme Court spoke directly on this point in *City of Canton*:

> "It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to **avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter** resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

> *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

Plaintiff attempts to support her conclusory allegations of a failure-to-train/discipline claim by alleging Cpl. Casebolt's previous MPD violations evidence McKinney's failure to discipline him. First and foremost, the "violations" that Plaintiff points out show Casebolt's violation of MPD Policies—not *Constitutional* violations. MPD sets its standard much higher than the barebones minimum that is required under the Constitution – it includes policies regarding professionalism, reporting, and implicates conduct far greater in scope than the conduct implicated by the United States Constitution. Second, Plaintiff fails to show how these prior violations evidence "[…] a pattern and practice of excessive force, particularly against black people." *Amended Complaint*, Doc. 50, p. 10 ¶ 39. Plaintiff's inclusion of Cpl. Casebolt's prior MPD violations indicate a desire to injure his reputation and character more than support a valid claim; Plaintiff includes multiple instances involving Cpl. Casebolt's girlfriend, the simple *filing* of meritless lawsuits against Cpl. Casebolt and McKinney, and other instances having no

relation to excessive force, false arrest, or race-based policing. *See id*., pp. 10-11, ¶¶ 38-46. When a plaintiff alleges a failure-to-train claim, "[t]he inadequacy of training must be closely related to the injury." *Pineda*, 291 F.3d at 332 (5th Cir. 2002). Cpl. Casebolt's prior MPD policy violations have no relation to Plaintiff's allegations of false arrest and excessive force—rather, this history of incidents and small policy violations fairly represent an officer with a decade-long career on patrol.

Third, Plaintiff cites multiple instances in which MPD *actually disciplined* Cpl. Casebolt. She alleges McKinney failed to discipline Cpl. Casebolt, yet in the same breath cites instances where Cpl. Casebolt was twice suspended without pay, dismissed from S.W.A.T. (incident involving girlfriend) and received a written reprimand (improper Facebook post). *Amended Complaint*, Doc. 50, pp. 10-11, ¶¶ 38-46. This application of McKinney Police Department's "Progressive Disciplinary Actions" is far from the "deliberate indifference" required for a meritorious failure-to-train claim. *See Plaintiff's Exhibit J*, p. 2.

Plaintiff's *Amended Complaint* (Doc. 50) repeats the elements of a failure-to-train claim over and over without the factual allegations to meet the plausibility standard required by *Iqbal*. Thus, **Issue No. 4** is resolved in the negative: Plaintiff has not pleaded sufficient factual allegations to avoid the dismissal of her failure-to-train claim under Federal Rule of Civil Procedure 12(b)(6).

### C. FAILURE OF STATE-LAW CLAIMS AGAINST MCKINNEY (ISSUE NO. 5)

#### 1. PLAINTIFF INDICATED AN INTENT TO NONSUIT HER STATE-LAW CLAIMS.

In *Plaintiff's Response to McKinney's Motion to Dismiss and for Summary Judgment* (Doc. 41), she indicated that she was not bringing any state-law claims against McKinney, and requested Leave to Amend for that purpose. Doc. 41, p. 46. However, it is unclear whether the *Amended Complaint* expressly dropped these claims (Plaintiff does not delineate between Defendants, states Cpl. Casebolt was at all times acting within his scope of employment, and incorporates all previous paragraphs for each cause of action). McKinney addresses Plaintiff's state-law claims out of an abundance of caution.

#### 2. PLAINTIFF FAILS TO PLEAD WAIVER OF IMMUNITY

Plaintiff's claims under Texas law fail as a matter of law in light of McKinney's governmental immunity. The doctrine of governmental immunity prohibits suits against a governmental entity unless there has been a clear and unambiguous constitutional or statutory waiver of that immunity. *Dallas County Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998); *Federal Sign v. Texas Southern University*, 951 S.W.2d 401, 405 (Tex. 1997); *University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175, 177 (Tex. 1994). Accordingly, Plaintiff must demonstrate that her cause of action against the City falls within some statutory waiver of governmental immunity to maintain this suit. Absent such a waiver, a trial court does not have subject matter jurisdiction over a suit against a governmental body. *Texas Department of Transportation v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999); *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Federal Sign*, 951 S.W.2d at 403; *Lamar University v. Doe*, 971 S.W.2d 191, 194 (Tex. App.—Beaumont 1998). Plaintiff's live pleading

does not mention any waiver of immunity; therefore, all her State-law claims should be dismissed. *See Amended Complaint*, Doc. 50.

### 3.  PLAINTIFF CANNOT PLEAD WAIVER OF IMMUNITY

Furthermore, Plaintiff cannot in good faith allege waiver of immunity. "[W]hether a governmental unit is immune depends entirely upon statute." *Bossley*, 968 S.W.2d at 341. (Tex. App.—El Paso 1997, writ denied); *Schaefer v. City of San Antonio*, 838 S.W.2d 688, 691 (Tex. App.—San Antonio 1992). In this case, the only waiver of governmental immunity that Plaintiff *could* rely upon in regards to her state-law claims against McKinney is that found within the Texas Tort Claims Act. *See Brown v. City of Houston*, 8 S.W.3d 331, 333-34 (Tex. App.—Waco 1999) (holding that the State and its political subdivisions enjoy full immunity from tort claims, except to the extent that their immunity is waived by the Texas Tort Claims Act).

The Texas Tort Claims Act, Texas Civil Practice & Remedies Code section 101.001, *et seq.* (hereinafter "the Act"), provides a waiver of governmental immunity for causes of action which fall within the immunity waiver requirements found in the Act. It is important to realize that the waiver of governmental immunity provided by the Act is a **limited** waiver, not a general one. *Bossley*, 968 S.W.2d at 341; *University of Texas Medical Branch at Galveston v. York*, 871 S.W.2d 175, 177 (Tex. 1994); *Kerrville State Hospital v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996). If a claim against a governmental entity does not fall within one of the areas specified in the statute, then the governmental entity retains its immunity from suit. *Duhart v. State*, 610 S.W.2d 740, 741-42 (Tex. 1980).

In order to invoke the trial court's jurisdiction, a plaintiff must plead a cause of action within the express terms of the Texas Tort Claims Act. *Texas Natural Resource and*

*Conservation Commission v. White*, 13 S.W.3d 819, 822 (Tex. App.—Fort Worth 2000) *(rev'd on other grounds*, 46 S.W.3d 864 (Tex. 2001)) (citing *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440, 446 (Tex. 1993)); *City of El Paso v. W.E.B. Investments*, 950 S.W.2d 166, 169 (Tex. App.—El Paso 1997, writ denied); *Schaefer v. City of San Antonio*, 838 S.W.2d 688, 691 (Tex. App.—San Antonio 1992).

The requirements that a cause of action must meet in order to come within the Texas Tort Claims Act's waiver of governmental immunity are found in sections 101.021 and 101.022. Section 101.021 provides as follows:

**Section 101.021 Governmental Liability**

A governmental unit in the state is liable for:

1    property damage, personal injury and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury or death arises from the operation or use of a motor driven vehicle or motor driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

2    personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem. Code § 101.021. The Texas Supreme Court has held that, in order to establish liability under §101.021(1) of the Texas Tort Claims Act, a claimant must show "a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor driven vehicle or motor driven piece of equipment." *LeLeaux v. Hamshire-*

*Fannett ISD*, 835 S.W.2d 49, 51 (Tex. 1992). Section 101.021(2) requires that in order for immunity to be waived the claim must involve "either defective or inadequate property, or use of property, by an employee of the governmental unit." *Harris v. Galveston County*, 799 S.W.2d 766, 768 (Tex. App.—Houston [14th Dist.] 1990, writ denied); *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983); *see also, Kassen, R.N. v. Hatley*, 887 S.W.2d 4, 13-14 (Tex. 1994).

Plaintiff fails to adhere to the notice requirements, plead any allegations or facts to implicate any negligent operation or use of motor-driven vehicles or equipment by McKinney; therefore, section 101.021(1) is not applicable. *See* Tex. Civ. Prac. & Rem. Code § 101.101 *regarding notice requirements.* Additionally, Plaintiff fails to plead a claim (and clearly cannot in good faith plead a claim) under Texas Civil Practice and Remedies Code section 101.022, which applies to premise and special defects. *See* Tex. Civ. Prac. & Rem. Code § 101.022.

To the extent that Plaintiff brings her negligence claim as a claim against McKinney for negligent training/hiring, those claims also must be rejected. The Texas Supreme Court has expressly stated that claims that do not allege injury resulting from the "condition or use of tangible personal or real property" (such as negligent hiring) fall out of the limited waiver offered by the Act. *State Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001). Plaintiff's claims of assault and battery and intentional infliction of emotional distress are expressly excluded from the waiver offered by the Act. Section 101.057 exempts from the Act's waiver of immunity any claim "arising out of an *assault*, *battery*, false imprisonment or any other intentional tort." Tex. Civ. Prac. & Rem. Code §101.057(2) (emphasis added). Governmental units enjoy derivative governmental immunity from this provision for the alleged

intentional torts of its employees. *University of Texas Medical Branch at Galveston v. Hohman*, 6. S.W.3d 767, 777 (Tex. App.—Houston [1ˢᵗ  Dist.] 1999, pet. denied); *Delaney v. University of Houston*, 835 S.W.2d 56 (Tex. 1992); *Townsend v. Memorial Medical Center*, 929 S.W.2d 264 (Civ. App. 1975).

**Issue No. 5** is resolved in the negative: Plaintiff's State-law claims fail as a matter of law; she has not pleaded any waiver to overcome McKinney's governmental immunity, and cannot in good faith "state a claim to relief that is plausible on its face" under Texas law. *Iqbal*, 556 U.S. at 678.

**D.  PLAINTIFF'S CLAIMS FOR EXEMPLARY DAMAGES FAIL AS A MATTER OF LAW (ISSUE NO. 6)**

**1.  PLAINTIFF INDICATED AN INTENT TO NONSUIT HER CLAIM FOR EXEMPLARY DAMAGES.**

In *Plaintiff's Response to McKinney's Motion to Dismiss and for Summary Judgment* (Doc. 41), she indicated that she was not bringing any claim for exemplary damages against McKinney, and requested Leave to Amend for that purpose. Doc. 41, p. 46. However, it is unclear whether the *Amended Complaint* expressly dropped these claims (Plaintiff does not delineate between Defendants, states Cpl. Casebolt was at all times acting within his scope of employment, and incorporates all previous paragraphs for each cause of action). McKinney addresses Plaintiff's state-law claims out of an abundance of caution.

**2.  TEXAS LAW DOES NOT AUTHORIZE EXEMPLARY DAMAGE CLAIMS AGAINST THE GOVERNMENT.**

Plaintiff asserts generally that she is entitled to "[e]xemplary and punitive damages[…]" with relation to all of her claims. *Amended Complaint*, Doc 50 pp. 22-23 ¶ 113. However, it is well settled that municipalities are not subject to liability for punitive damages under 42 U.S.C. §

1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Dorward v. Ramirez*, Civil Action No. 3:09-CV-0018-D, 2009 U.S. Dist. Lexis 77710, at *64 (N.D. Tex. 2009). Additionally, Texas state law does not authorize the recovery of exemplary damages against governmental entities on state-law claims. *See* Tex. Civ. Prac. & Rem. Code § 101.024. Without retreading the legal arguments above regarding the Plaintiff's failure and inability to plead McKinney's waiver of immunity, McKinney re-iterates and incorporates those paragraphs herein. Plaintiff has not pleaded a waiver of McKinney's immunity under the Texas Tort Claims Act with regard to liability for exemplary damages, and cannot under section 101.024 of the Texas Civil Practice & Remedies Code which clearly states: "This chapter does not authorize exemplary damages." Tex. Civ. Prac. & Rem. Code § 101.024.

Therefore, **Issue No. 6** is resolved in the negative; Plaintiff has not pleaded and cannot plead sufficient factual allegations to address McKinney's immunity from exemplary damages, and therefore Plaintiff's claims for exemplary damages should be dismissed in their entirety under Federal Rule of Civil Procedure 12(b)(6).

## VII.   CLAIMS SUBJECT TO SUMMARY JUDGMENT

### A.   PLAINTIFF'S CLAIMS AGAINST MCKINNEY FAIL AS A MATTER OF LAW.

McKinney incorporates herein the briefing on Issues 1-3, supra, on the *Monell* burdens and claims, and further states that Plaintiff has not adequately established a constitutional violation pursuant to a policy/custom created or ratified by a final policymaker sufficient to impose *Monell* liability on McKinney.  *See Praprotnik*, 485 U.S. at 127; *Gelin v. Housing Authority of New Orleans*, 456 F.3d 525, 527 (5th Cir. 2006)  (holding a policy made by an official with "final policy making authority" is required to hold a municipality liable under §

1983). In addition to Plaintiff's failure to properly plead a municipal liability claim, as outlined in Issues 1-3, supra, Plaintiff must produce evidence to create a genuine issue of material fact for each and every element under the *Monell* framework. *See* Fed. R. Civ. P. 56.

1. **PLAINTIFF FAILS TO PRODUCE EVIDENCE RAISING A FACT ISSUE FOR POLICY AND FINAL POLICYMAKER (ISSUE NOS. 7 AND 8)**

The Plaintiff's shotgun pleading asserting a vague "policy" not only fails to meet the *Iqbal/Twombly* pleading standard, but also fails to raise a fact issue on the existence of an official "policy." Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Without more, **Issue No. 7** is resolved in the negative: Plaintiff fails to produce evidence raising a genuine issue of material fact as to the existence of a "policy" under the *Monell* municipal liability framework, and thus McKinney is entitled to summary judgment on all claims.

Without pleading a clear policy, Plaintiff again attempts to meet the pleading standard by reciting in the *Amended Complaint* (Doc 50) an assortment of different individuals as final "policymakers" under the *Monell* framework (see section V.B, supra). Again, this conclusory pleading fails to adhere to not only the *Iqbal/Twombly* plausibility standard, but also clearly falls short of creating a genuine issue of material fact. **Issue No. 8** is resolved in the negative: Plaintiff fails to produce evidence raising a genuine issue of material fact as to the existence of a final "policymaker" under the *Monell* municipal liability framework, and thus McKinney is entitled to summary judgment on all claims.

## 2. PLAINTIFF FAILS TO PRODUCE EVIDENCE SUPPORTING A CONSTITUTIONAL VIOLATION (ISSUE NO. 9)

To bring a claim under 42 U.S.C. § 1983, Plaintiff must state a violation of the United States Constitution or federal law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiff cannot support any allegation of a constitutional violation. Consequently, her claims against Cpl. Casebolt (and derivatively against McKinney) fail under 42 U.S.C. § 1983 and should be dismissed with prejudice. McKinney fully incorporates and relies upon *Defendant Casebolt's Reasserted Motion for Summary Judgment*. Doc. 53 ("Casebolt's MSJ"). When there has been no underlying constitutional violation by municipal employees, there can be no municipal liability based upon those employees' acts. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 426 (5th Cir. 2006); *Saenz v. Heldenfels Bros.*, Inc., 183 F.3d 389, 392-93 (5th Cir. 1999). If Plaintiff does not properly plead and does not produce evidence raising a fact issue for all elements of her constitutional claims against Cpl. Casebolt, then her vicarious claims against McKinney also fail.

### a. Plaintiff Cannot Support her False Arrest Claim.

To overcome summary judgment on her false arrest claim, Plaintiff needs to provide evidence that creates a genuine issue of fact for each element: that (1) she was willfully detained; (2) without consent; and, (3) without authority of law. *Sanders v. Schulze,* No. 3:15-CV-89-N, 2015 U.S. Dist. LEXIS 126576, *17–18 (N.D. Tex. Aug. 31, 2015) (citing *Gladden v. Roach*, 864 F.2d 1196, 1201 (5th Cir. 1989)). She must also show that Cpl. Casebolt had neither probable cause nor reasonable suspicion for the arrest/detention. *See Haggerty v. Texas S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) (probable cause); *see United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reasonable suspicion for investigatory detention). "Probable cause exists when the

totality of facts and circumstances within a police officer's knowledge *at the moment of arrest* are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (citing *Flores v. City of Palacios,* 381 F.3d 391, 402 (5th Cir. 2004)). "In determining whether probable cause exists, a court is required only to find a basis for an officer to believe to a 'fair probability' that an offense occurred." *Tittle v. Raines*, 231 F. Supp. 2d 537, 547 (N.D. Tex. 2002), *aff'd*, 69 F. App'x 658 (5th Cir. 2003) (citing *Piazza v. Mayne,* 217 F.3d 239, 245–46 (5th Cir. 2000). For reasonable-suspicion determinations, courts must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 273; *see, e.g., United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

As outlined (and relied upon) in Casebolt's MSJ, he arrived on the scene of an unruly crowd with reports of fighting. The crowd was not responding to Casebolt's direct commands. Plaintiff verbally and physically opposed Casebolt's multiple commands to leave the area, thereby interfering with his public duties in violation of Texas Penal Code § 38.15. The undisputed evidence shows that Cpl. Casebolt had both reasonable suspicion and probable cause to detain and/or arrest Plaintiff; therefore, her False Arrest claim fails.

### b.  Plaintiff Cannot Support her Excessive Force Claim.

To establish a Fourth Amendment violation based on excessive force, Plaintiff is required to show: "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (citing *Rockwell v. Brown,* 664 F.3d 985, 991 (5th Cir. 2011)).

An excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989). "Whether the force was reasonable under the Fourth Amendment is determined from the perspective of a reasonable officer on the scene, rather than with 'the 20/20 vision of hindsight.'" *Ramirez*, 716 F.3d at 377 (quoting *Rockwell,* 664 F.3d at 991). The officer's actions must be viewed "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397; *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382-83 (5th Cir. 2009); *see also Brosseau v. Haugen*, 543 U.S. 194, 201 (2004); *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

Once again as outlined (and relied upon) in Casebolt's MSJ, the video evidence shows unequivocally that Plaintiff resisted detention from the outset, Casebolt did not strike Plaintiff nor use any force beyond hand control and attempted to detain Plaintiff amidst tense, rapidly evolving circumstances. Therefore, Casebolt applied an appropriate amount of force, and such force was neither clearly excessive to the need nor unreasonable under the circumstances.

Plaintiff cannot support her claims for False Arrest and Excessive Force. Without a genuine fact issue on the existence of a constitutional violation, Plaintiff's claims against the City of McKinney must be dismissed pursuant to Federal Rule of Procedure 56. **Issue No. 9** is resolved in the negative; therefore, McKinney is entitled to summary judgment on all federal-law constitutional claims.

**3.** **PLAINTIFF FAILS TO PRODUCE EVIDENCE RAISING A FACT ISSUE FOR A POLICY AS THE MOVING FORCE OF A CONSTITUTIONAL VIOLATION (ISSUE NO. 10)**

Even if Plaintiff *could* show that her constitutional rights were violated, she would additionally need to properly plead and produce evidence raising a fact issue (as stated in Issues 1-3, supra) that a "policy" was the *moving force* behind the alleged constitutional violation. As stated before, Plaintiff has not pleaded a plausible right to relief on this point, and additionally cannot produce evidence sufficient to create a genuine issue of material fact under Federal Rule of Civil Procedure 56. **Issue No. 10** is resolved in the negative: Plaintiff fails to produce evidence raising a genuine issue of material fact as to the existence of a constitutional violation whose moving force is a policy or practice/custom under the *Monell* municipal liability framework, and thus McKinney is entitled to summary judgment on all claims.

**B.** **PLAINTIFF'S FAILURE-TO-TRAIN CLAIM FAILS AS A MATTER OF LAW (ISSUE NO. 11)**

McKinney re-iterates and incorporates its arguments above regarding failure-to-train claims (see Issue 4, supra) into this paragraph. The Plaintiff not only fails to properly plead, but also fails to produce evidence raising a genuine issue of material fact for each element of a failure-to-train claim: (1) identify specific training that was inadequate; (2) establish this lack of training proximately caused the alleged injury to D.B.; and (3) prove any alleged inadequate training was the result of deliberate indifference by McKinney policymakers to the Constitutional rights of citizens. *See Pineda v. City of Houston*, 291 F.3d 325, 331-32 (5th Cir. 2002); *Cozzo v. Tangipahoa Parish Council-President Government, et al.*, 279 F.3d 273, 286 (5th Cir. 2002); *Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000); *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).

Cpl. Casebolt indicates in his Declaration that he, like every other police officer in Texas, has consistently adhered to the state-wide training requirements. U.F. 1-3. He received refresher materials and training regarding the lawful use of force, lawful arrests and detentions and seizures. *Id*. The undisputed evidence shows that Casebolt received the state-required amount of training and was clearly qualified to be a police officer in Texas. *Id.* Not only does the Plaintiff fail to assert factual allegations that would meet the high requirements for failure-to-train claims, but the undisputed evidence shows that Casebolt was, in fact, properly trained.

 **Issue No. 11** is resolved in the negative: Plaintiff fails to produce evidence raising a genuine issue of material fact as to each and every element of a failure-to-train claim, and thus McKinney is entitled to summary judgment on this claim.

## C. MCKINNEY IS ENTITLED TO SUMMARY JUDGMENT ON ALL STATE-LAW CLAIMS (ISSUE NO. 12)

 As outlined in Issue 6, supra, and incorporated into this paragraph by reference, Plaintiff has not pleaded sufficient facts that would overcome McKinney's governmental immunity defenses, nor can she plead in good faith the limited waiver allowed under Texas law. *See* Tex. Civ. Prac. & Rem. Code § 101.104. In addition to dismissal under Federal Rule of Civil Procedure 12(b)(6), McKinney is entitled to summary judgment on all state-law claims under Federal Rule of Civil Procedure 56.

 **Issue No. 12** is resolved in the negative: Plaintiff can neither plead nor provide evidence raising a genuine issue of material fact to overcome McKinney's governmental immunity. Therefore, McKinney is entitled to summary judgment on all state-law claims.

### D.  McKinney is Entitled to Summary Judgment on All Claims for Exemplary Damages (Issue No. 13)

As outlined in Issue 7, supra, and incorporated into this paragraph by reference, Plaintiff has not and cannot plead a valid claim for exemplary/punitive damages against McKinney, and certainly cannot produce evidence raising a genuine issue of material fact on the issue. In addition to dismissal under Federal Rule of Civil Procedure 12(b)(6), McKinney is entitled to summary judgment on all claims for exemplary damages under Federal Rule of Civil Procedure 56.

Issue No. 13 is resolved in the negative: Plaintiff can neither plead nor produce evidence raising a genuine issue of material fact to challenge McKinney's exemption from exemplary damages. Therefore, McKinney is entitled to summary judgment on all claims for exemplary damages.

## VIII.   CONCLUSION AND PRAYER

Plaintiff fails to satisfy her pleading burden for any of her claims against McKinney; she fails to properly plead any municipal liability claim under 42 U.S.C. § 1983, and fails to address the bevy of immunity defenses. She additionally fails to show any constitutional violation by Cpl. Casebolt, thereby preventing any claims against McKinney. Plaintiff's claims against McKinney must be dismissed under Federal Rule of Civil Procedure 12(b)(6) or dismissed as McKinney is granted summary judgment.

WHEREFORE PREMISES CONSIDERED, City of McKinney prays that its *Amended Motion to Dismiss and, in the Alternative, Motion for Summary Judgment* be granted as to Plaintiff's claims in their entirety, or such partial relief as the Court deems just, and for such

other and further relief in equity or in law to which Defendants may show themselves justly

entitled.

Respectfully submitted,

**MCKAMIE KRUEGER, L.L.P.**

<u>          *s/ Christopher M. Lowry*          </u>
**WILLIAM W. KRUEGER, III**
State Bar No. 11740530
bill@mckamiekrueger.com
**CHRISTOPHER M. LOWRY**
State Bar No. 24093626
clowry@mckamiekrueger.com

500 W. Lookout Dr.
Richardson, Texas 75080
214-253-2600 – Telephone
214-253-2626 – Facsimile
**ATTORNEYS FOR DEFENDANTS**
**THE CITY OF MCKINNEY AND THE**
**MCKINNEY POLICE DEPARTMENT**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of *Defendant's, the City of McKinney's Amended Motion to Dismiss and, in the Alternative, Motion for Summary Judgment* was served on all counsel of record via the ECF System on the 22nd day of June, 2017.

<u>          *s/ Christopher M. Lowry*          </u>