**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **D.B.,** by and through Next Friend, | § | |
| **SHASHONA BECTON** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **4:16-cv-00965-ALM** |
| **DAVID ERIC CASEBOLT,** and | § | |
| **CITY OF MCKINNEY, TEXAS** | § | |
| | § | |
| *Defendants* | § | |

═══════════════════════════════════════════

**PLAINTIFF'S RESPONSE TO DEFENDANT**
**CASEBOLT'S REASSERTED MOTION FOR SUMMARY JUDGMENT**

═══════════════════════════════════════════

COMES NOW, the Plaintiff, D.B. (a minor) by and through her Next Friend, Shashona Becton, and files this Response to Defendant Casebolt's Reasserted Motion for Summary Judgment, and respectfully show the court as follows:

# TABLE OF CONTENTS

I.     SUMMARY ................................................................................................ 1

II.    FACTS ..................................................................................................... 2

III.   STAGE AND NATURE OF PROCEEDINGS ................................. 7

IV.    SUMMARY OF FACTS IN DISPUTE ........................................... 8

V.     STANDARDS FOR ANALYZING QUALIFIED IMMUNITY .................... 20

   A. Two Prongs of Federal Qualified Immunity Analysis ..................... 20

   B. Texas Official Immunity Analysis ................................................ 21

   C. Plaintiff's Summary Judgment Burden ........................................ 21

VI.    ARGUMENTS AND AUTHORITIES ............................................. 22

ISSUE NO. 1

BECAUSE D.B. SUED BOTH THE CITY OF MCKINNEY AND CPL. CASEBOLT UNDER
TEXAS LAW, CAN SHE AVOID THE IMMEDIATE IRREVOCABLE STATUTORY BAR OF
TEX. CIV. PRAC. & REM. CODE § 101.106 AND PROCEED WITH TEXAS LAW CLAIMS
AGAINST CPL. CASEBOLT FOR FALSE ARREST, ASSAULT AND BATTERY, AND
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS? ................................................. 23

   A. The Court Must Determine that Plaintiff's Texas Law Claims Arise From Casebolt's
      Performance in the Scope of His Duties. ............................................. 23

   B. Plaintiff Made an Immediate Irrevocable Statutory Election. ............................ 23

      1. Plaintiff's First Amended Complaint Does Not Assert Any Texas State Claims Against
         McKinney. ......................................................................................... 24

      2. Claims against Defendant are not subject to Immediate Dismissal. ........................... 24

   C. Casebolt is Not Statutorily Immune to Claims Within the General Scope of His Duties. 25

   D. Plaintiff's Intentional Infliction of Emotional Distress (IIED) Is a Viable Claim Against
      Defendant Casebolt. ....................................................................... 25

ISSUE NO. 2

IN CONNECTION WITH HER FALSE ARREST CLAIM, UNDER THE TOTALITY OF
CIRCUMSTANCES FACING CPL. CASEBOLT, CAN D.B. CARRY HER BURDEN OF
ESTABLISHING A FOURTH AMENDMENT VIOLATION OR FALSE ARREST UNDER
TEXAS LAW IN ORDER TO OVERCOME CPL. CASEBOLT'S QUALIFIED IMMUNITY OR
IMMUNITY UNDER TEXAS LAW? ......................................................................... 26

   Legal Standard ....................................................................................... 26

   Reasonable Suspicion ............................................................................. 27

   Alleged Violation of Texas Penal Code § 38.15 ................................................. 27

   Distinguishable Case Law Cited by Defendant ................................................. 28

   A. CASEBOLT VIOLATED CLEARLY ESTABLISHED LAW ......................................... 30

      1. Particularized Facts ........................................................................... 30

2. Reasonableness ............................................................................................. 33

ISSUE NO. 3

IN CONNECTION WITH HER EXCESSIVE FORCE CLAIM, UNDER THE TOTALITY OF CIRCUMSTANCES FACING CPL. CASEBOLT, CAN D.B. CARRY HER BURDEN OF ESTABLISHING A FOURTH AMENDMENT VIOLATION OR ASSAULT AND BATTERY UNDER TEXAS LAW IN ORDER TO OVERCOME CPL. CASEBOLT'S QUALIFIED IMMUNITY OR IMMUNITY UNDER TEXAS LAW? .......................................................... 35

    A.  Qualified Immunity ...................................................................................... 35

    Totality of Circumstances .................................................................................. 35

    1. Level of Force Used was Excessive Under the Circumstances .................................... 36

    2. No Court Has Held That Similar Uses of Force Was Not Excessive. .......................... 39

B.  D.B. CAN SHOW CASEBOLT VIOLATED CLEARLY ESTABLISHED LAW – UNDER THE PARTICULARIZED FACTS OF THIS CASE – TO OVERCOME THE SECOND PRONG OF QUALIFIED IMMUNITY ............................................................................. 43

CASEBOLTS SUMMARY JUDGMENT FAILS ....................................................... 45

    A. A genuine issue of material fact exists with regard to Plaintiffs' excessive-force claim.  45

    B. Severity of the crime at issue. .......................................................................... 47

    C. There was no immediate threat to the safety of the officer or others .............................. 47

    D. A reasonable officer would have concluded that Casebolt used excessive force. ........... 49

    E. Casebolt's actions violated McKinney Police policy. ..................................................... 50

VII.    CONCLUSION AND PRAYER .................................................................. 51

CERTIFICATE OF SERVICE ................................................................................. 52

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 248 (1986). ........................................................................................... 22

*Arshad v. Congemi,*
   2009 WL 585633 (5th Cir. 2009) ................................................................................ 42

*Bazan v. Hidalgo County*,
   246 F.3d 481, 492 (5th Cir. 2001). ............................................................................. 22

*Britschge v. Harmison,*
   947 F.Supp. 435 (D.C. Kan. 1996) .............................................................................. 39

*Brown v. Gilmore*,
   278 F.3d 362 (4th Cir. 2002) ....................................................................................... 41

*Brown v. Lyford*,
   243 F.3d 185, 189 (5th Cir. 2001) ............................................................................... 26

*Cantu v. Rocha,*
   77 F.3d 795, 804 (5th Cir. 1996) ................................................................................. 21

*Case v. Stewart,*
   2007 WL 37741 (W.D.N.C. 2007) .............................................................................. 42

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 323 (1986). ........................................................................................... 21

*Dean v. City of Shreveport,*
   438 F.3d 448, 454 (5th Cir. 2006). .............................................................................. 22

*Flores v. City of Palacios*,
   381 F.3d 391, 399 (5th Cir. Tex. 2004). .................................................................. 1, 21

*Geils v. Patin,*
   941 F. Supp. 2d 722, 727 n.5 (N.D. Tex. 2012) .............................................. 20, 35, 45

*Glenn v. City of Tyler,*
   242 F.3d 307, 313 (5th Cir. 2001) ............................................................................... 27

*Gooden v. Howard County, Md.*,
   954 F.2d 960, 971 (4th Cir. 1992). .............................................................................. 21

*Haggerty v. Texas Southern University*,
   391 F.3d 653, 656 (5th Cir. 2004) ....................................................... 21, 26, 27, 29, 43

*Isquith v. Middle South Utilities, Inc.*,
   847 F.2d 186, 198–200 (5th Cir. 1988). .................................................................. 22

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
   910 F.2d 167, 178 (5th Cir. 1990) .......................................................................... 22

*Mission Consolidated I.S.D. v. Garcia*,
   253 S.W.3d 653, 657 (Tex. 2008) .......................................................................... 24

*Mitchell v. Yeadon Borough*,
   2002 WL 265021 (E.D.Pa. 2002) .......................................................................... 40

*Mullenix v. Luna*,
   577 U.S., at —— – ——, 136 S.Ct., at 308. .......................................................... 30

*Rockwell v. Brown*,
   664 F.3d 985, 993 (5th Cir. 2013). ........................................................................ 21

*Spencer v. Rau*, 542 F.Supp.2d 583 (W.D. Tex. 2007) ............................................. 28

*Tolan v. Cotton*,
   713 F.3d 299, 306-307 (5th Cir. Tex. 2013)................................................. 1, 21, 22

## Rules

Fed. R. Civ. P. 56. ................................................................................................... 19

## Statutes

Tex. Penal Code § 22.01 ................................................................................... 27, 33

Tex. Penal Code § 38.15 ........................................................................... 12, 23, 25, 32

# I.   SUMMARY

1.      Casebolt's Reasserted Motion for Summary Judgment based on his qualified-immunity defense should be denied because there are genuine issues of material fact as to whether the Casebolt's use of force was objectively reasonable under clearly established law.

2.      When asserting qualified immunity in a summary judgment motion, summary judgment should be denied if there is a genuine question of material fact as to whether or not the police officer reasonably believed that the suspect posed an immediate and significant threat to anyone.[1]  Summary judgment is not proper if the nonmovant can point to evidence that contradicts the moving party's version of events.[2]

3.      The evidence presented by Plaintiffs and in Defendant Casebolt's own summary judgment motion show contradictory facts about what actually happened at the moment of D.B.'s assault and detention raises many genuine issues of material facts as to whether Casebolt reasonably believed that D.B. posed a threat and whether there was probable cause for her detention.

4.      Defendant Casebolt asserts three "Issues to be Decided" in his Reasserted Motion for Summary Judgment.[3]  Those issues are as follows:

A.  Issue No. 1 – Because D.B. sued both the City of McKinney and Cpl. Casebolt under Texas law, can she avoid the immediate irrevocable statutory bar of Tex. Civ. Prac. & Rem. Code § 101.106 and proceed with Texas law claims against Cpl. Casebolt for false arrest, assault and battery and intentional infliction of emotional distress?

B.  Issue No. 2 – In connection with her false arrest claim, under the totality of circumstances facing Cpl. Casebolt, can D.B. carry her burden of establishing a Fourth Amendment violation or false arrest under Texas law in order to overcome Cpl. Casebolt's qualified immunity or immunity under Texas law?

---

[1] *Flores v. City of Palacios*, 381 F.3d 391, 399, 2004 U.S. App. LEXIS 16477, *19 (5th Cir. Tex. 2004).
[2] *Tolan v. Cotton*, 713 F.3d 299, 306-307 (5th Cir. Tex. 2013).
[3] Doc. 53 p. 3.

C. <u>Issue No. 3</u> – In connection with her excessive force claim, under the totality of circumstances facing Cpl. Casebolt, can D.B. carry her burden of establishing a Fourth Amendment violation or assault and battery under Texas law in order to overcome Cpl. Casebolt's qualified immunity or immunity under Texas law?

5.      The answer to each of these issues is "YES."  D.B. can establish valid false arrest, excessive force, assault and battery, and all other claims which overcome Defendant Casebolt's entitlement to any type of immunity.  Casebolt never had probable cause to detain or exercise the level of force used against D.B.  None of his actions were reasonable.  Each of these issues shall be addressed more fully below.

## II.    FACTS

1.      On June 5, 2015, D.B., a minor child, who had been invited by a resident, attended a pool party at Craig Ranch, a subdivision located in the city of McKinney, Texas.

2.      The City of McKinney Police were called to the pool party for a "disturbance."  No one alleged or accused D.B. of breaking the law or committing any crime. McKinney Police Corporal David "Eric" Casebolt was one of the senior officers who arrived on the scene.

3.      As soon as he arrived on the scene Defendant Casebolt began yelling and shouting obscenities at the minors.  He grabbed one male teenager by the head and forced him to the ground.[4]  "Get your asses on the ground!" A group of boys sat on the ground.  Defendant Casebolt then ran and accosted two boys who were standing in the street and yelled at them to "Get the fuck over here!"[5] After yelling at a group of girls shouting "Get your ass out of here!" Casebolt returned to the boys he had directed to sit in the grass.  They were not attempting to flee. Nor were they making any threatening gestures. Regardless, Casebolt proceeded to handcuff them.[6]

---

[4] YouTube video at 0:51.
[5] *Id.* at 0:57.
[6] *Id.* at 1:19 – 1:25.

4.      D.B walked on the sidewalk to try to find her bag so she could retrieve her cell phone to call her parents.[7]  As the image below depicts, D.B. was a safe distance (at least ten feet)



away from Casebolt.[8]  D.B. did not attempt to make any verbal or physical contact with Casebolt. Nor did D.B. make any effort whatsoever to interfere with Casebolt placing the boys in cuffs.  In fact, according to the video, Casebolt had both boys securely cuffed in approximately ten seconds.[9]

5.      Casebolt then took a few moments to survey the scene. He even crossed the street at one point.[10] He specifically made it a point to detain almost all of the black males that he encountered.  He already had a group of black boys sitting in the grass.  None of them were attempting to leave.

6.      Casebolt started swearing at the boys yelling "Y'all make me fucking run around here with thirty pounds of God-damn gear on in the sun 'cause you want to screw around out here!"[11]  Casebolt then yelled toward a group of kids and to no one in particular, "Get your ass out of here!"

---

[7] *Id.* at 1:19.
[8] Exhibit D – Still Image from YouTube Video at 1:19.
[9] YouTube Video at 1:18 – 1:30.
[10] *Id.* at 1:57.
[11] *Id.* at 2:20.

**PLAINTIFF'S RESPONSE TO DEFENDANT CASEBOLT'S**
**REASSERTED MOTION FOR SUMMARY JUDGMENT**                    **Page 3**

7.      Casebolt then turned his attention to the group of girls who were standing nearby and began yelling profanity at them and threatened to arrest them for talking.  "Y'all keep standing there running your mouths and you're gonna go too."[12]  "Get out of here."  Some of the girls tried to reason with Casebolt. But he wouldn't listen. He just kept yelling. "I don't care!" "You're leaving now." "You are leaving now!" "Leave!" "Then get your ass gone!" "Keep running your mouth!"[13]

8.      As D.B. was leaving the area, (in compliance with Casebolt's unclear commands), she turned to a friend behind her asked that he "Call my mama" so she could inform her of where to find her.[14]  Defendant Casebolt then turned toward D.B. with his baton raised forward and angrily yelled "YOU!" Casebolt started toward D.B. who was approximately 15 – 20 feet away



from Casebolt, at that time. As the above image depicts. D.B. is on the far right.[15]  D.B. was not anywhere near Casebolt. D.B. did not approach Casebolt. D.B. did not converse with Casebolt. D.B. did not in any way make any attempt to interfere with Casebolt's duties.

9.      Once he reached her, Casebolt, using his training and techniques, grabbed D.B. by

---

[12] *Id*. at 2:27 and Exhibit E – Still image from YouTube video at 2:27
[13] YouTube Video at 2:49.
[14] *Id*. at 2:50 and 2:52.
[15] *Id*. at 2:50; and Exhibit E.

the wrist and twisted her arm behind her back.  He repeatedly called her a "motherfucker" as he violently swung her around and threw her down on the ground.

10.     Then Casebolt yanked her up by her arm and viciously slammed D.B. on the concrete sidewalk.[16] (See Exhibit F below.)[17]



11.     Several of D.B.'s friends rushed to check on her. In his rage, Defendant Casebolt forcefully pushed one girl, J.B. Casebolt drew his service weapon on two boys.[18]  Two other officers rushed in to stop Casebolt.[19]  Casebolt even pushed the officers aside.

12.     Casebolt returned to D.B. where she was still sitting on the ground crying and begging for someone to call her mama.  Casebolt pulled D.B. up from her seated position and then yelled "Get on the ground!" as he slammed her back to the ground.[20] Casebolt pulled D.B.'s hair several times during this violent encounter as he repeatedly slammed her face into the ground. "On your face!" he yelled.[21]

---

[16] *Id*. at 3:05.
[17] *Id*.; and Exhibit F – Still Image from YouTube Video at 3:05
[18] YouTube Video at 3:12.
[19] *Id*. at 3:14.
[20] *Id*. at 3:20 -3:25.
[21] *Id*. at 3:25.

13.     Defendant Casebolt then straddled D.B. thrusting one knee into her back and one knee on her neck.[22] (See Exhibit G below.)  D.B. cried out in pain and repeatedly told Casebolt



that he was hurting her. Even after Defendant Casebolt had D.B. down on the ground beneath his entire body weight, he continued his assault on D.B. by repeatedly grabbing the back of her head and forcing her face into the ground.  Casebolt remained seated on top of D.B. for several minutes.

14.     At no time was D.B. accused or suspected of committing a crime.  At no point did D.B. attempt to flee, or harm Casebolt, or interfere with his official duties. Despite this, and for no lawful reason, Casebolt still assaulted and detained D.B. and had her placed in handcuffs.

15.     The entire time D.B. could do nothing by cry out in pain and repeatedly beg for her "Mama" as she endured the pain inflicted upon her by Casebolt's physical assault. At the time, D.B. was only 15 years old and barely weighed over 100 pounds. She was wearing nothing but a bikini bathing suit.

16.     Officer Casebolt used excessive force during the unlawful detention which caused

---

[22] *Id*. at 3:57; and Exhibit G – Still Image from YouTube Video at 3:57.

D.B.'s bodily injuries. As a result of the incident and subsequent injuries, D.B. continues to suffer and is in psychological distress from the assault.[23] No charges were ever filed against D.B.

17.      Defendant Casebolt had no probable cause or reasonable suspicion to believe that D.B. was or had committed a crime. In fact, there are eyewitnesses to the entire incident who did not see D.B. breaking any laws prior to being physically assaulted by Defendant Casebolt.

18.      As a result of Defendant Casebolt's unlawful attack on D.B., D.B. sustained multiple injuries, including injuries to her back, neck, and arms.[24]

### III.      STAGE AND NATURE OF PROCEEDINGS

Plaintiff's First Amended Complaint (Doc. 50) is Plaintiff's live pleading. Defendant Casebolt filed an *Answer to First Amended Complaint Including Assertions of Immunity* asserting immunity defenses.  (Doc. 51 pp. 9-12 ¶¶ 2.01, 2.02, 2.06, 2.07 and 3.01-3.08.)

Plaintiff complains that Casebolt assaulted and unlawfully detained her or falsely arrested her (Complaint, Doc. 50 pp. 6-8 ¶¶ 20-29). Plaintiff sues Casebolt and the City of McKinney asserting several counts as follows:

**Count I** – Excessive force in violation of the Fourth Amendment to the U.S. Constitution (Complaint, Doc. 50 p. 1 ¶ 1 and pp. 13-14 ¶¶ 59-64) (against Casebolt and McKinney).

**Count II** – Failure to Train Casebolt (Complaint, Doc. 50 pp. 14-18 ¶¶ 65-82 (asserted only against the City of McKinney).

**Count III** – False Arrest in violation of the Fourth Amendment to the U.S. Constitution (Complaint, Doc. 50 p. 1 ¶ 1 and pp. 18-19 ¶¶ 83-87) (asserted against Casebolt and McKinney).

**Count IV** – Negligent hiring of Casebolt (Complaint, Doc. 50 p. 19 ¶¶ 88-90) (asserted only against McKinney).

**Count V** – Assault and Battery (Complaint, Doc. 50 p. 1 ¶ 1 and p. 19 ¶¶ 91-93) (asserted against Casebolt).

---

[23] Declaration of D.B., Exhibit A at p. 3 ¶¶ 19 – 24; Exhibit B at p. 2 ¶¶ 9 – 10.
[24] Declaration of D.B., Exhibit A at p. 3 ¶ 20.

**Count VI** – Gross Negligence in apprehending and using force against Plaintiff D.B. (Complaint, Doc. 50 p. 1 ¶ 1 and pp. 20-21 ¶¶ 94-102) (asserted against Casebolt).

**Count VII** – Intentional Infliction of Emotional Distress (Complaint, Doc. 50 p. 1 ¶ 1 and p. 21 ¶¶ 103-109) (asserted against only Casebolt).

**Count VIII** – Damages (generally) (Complaint, Doc. 50 p. 22 ¶¶ 110-112) (against Casebolt and McKinney as to each respective claim).

**Count IX** – Punitive/Exemplary Damages (Complaint, Doc. 50 pp. 22-23 ¶ 113) (asserted only against Casebolt).

## IV.    SUMMARY OF FACTS IN DISPUTE

Plaintiff vehemently disputes each of Defendant's forty-five "Undisputed Facts" for the

following reasons:

1.    **Casebolt Allegation No. 1** – At the time of the incident, Cpl. Casebolt was an experienced Police Officer with training and experience working for the United States Navy as a Military Police Officer, the Texas Department of Public Safety as a State Trooper, and the City of McKinney Police Department. He completed and complied with all ongoing Law Enforcement Officer training mandated by the State of Texas (Casebolt Dec., Apx. pp. 2-3 ¶¶ 3-4).

      **Plaintiff's Response:**

      Disputed.  Casebolt has presented absolutely no evidence to support this claim, other than

his own self-serving statements.  In fact, his disciplinary history and actions speak to the contrary.[25]

2.    **Casebolt Allegation No. 2** – On the day of the incident, Casebolt was dressed in a dark blue Police Officer uniform with badges and insignia and equipment which in combination made him immediately recognizable as a Police Officer. His vehicle was an immediately recognized marked Police vehicle (Casebolt Dec., Apx. p. 3 ¶ 5).

      **Plaintiff's Response:**

      Disputed. Officer's vehicle is not visible in the evidence presented.

3.    **Casebolt Allegation No. 3** – On June 5, 2015, the McKinney Police Department ("MPD") began receiving calls from a number of people reporting a disturbance and fighting at a private pool and private park owned by a Homeowner's Association in the Craig Ranch neighborhood. The initial reports indicated that the management and security guard were unable to control a large crowd which contained multiple juveniles who did not live in the

---

[25] *See* Exhibit C; Exhibit H, Chief Greg Conley Press Conference Video.

area and who had been asked to leave the private property, but refused to leave (Casebolt Dec., Apx. pp. 3-4 ¶¶ 6-8; and MPD Communication Notes, Apx. p. 16).

**Plaintiff's Response:**

Disputed.   D.B. was present at the scene. She was an eye-witness. D.B. specifically provides that only three or four boys jumped the fence.[26]

4.   **Casebolt Allegation No. 4** – The complainants also reported that a large number of people were climbing or jumping a fence to get into a swimming pool area. The initial reports indicated that there was fighting going on and people were throwing things at people or cars (Casebolt Dec., Apx. p. 4 ¶ 8; and MPD Communication Notes, Apx. p. 16).

**Plaintiff's Response:**

Disputed.  Plaintiff D.B. was present at the scene. She was an eye-witness. Declaration of D.B. states that only three or four boys jumped the fence to gain access to the pool area.[27]

5.   **Casebolt Allegation No. 5** – When Casebolt first arrived in the neighborhood near the pool, he could see large numbers of teenagers or young adults randomly moving in different directions with some moving toward the pool and others moving away from the pool area, and others in groups near the pool area (Casebolt Dashcam, counter 5:00-5:29).

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is conclusory and subjective.

6.   **Casebolt Allegation No. 6** – Casebolt could see a crowd of teenagers or young adults inside the fenced area surrounding the private pool – as many as 60, mostly males, inside that area (Casebolt Dec., Apx. p. 4 ¶ 9) (Casebolt Dashcam counter 5:00-5:08)

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is conclusory and subjective.

7.   **Casebolt Allegation No. 7** – Cpl. Casebolt saw a uniformed security guard who appeared to have been in a fight because his clothing was disheveled and shirt was partially untucked (Casebolt Dashcam counter 5:00-5:08; Casebolt Dec., Apx. p. 4 ¶ 10).

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is speculative and conclusory.

---

[26] Declaration of D.B., Exhibit A at p. 1 ¶ 4.
[27] *Id.*

8.      **Casebolt Allegation No. 8** – Casebolt made several requests for someone to tell him where the fighting was going on. An adult male pointed toward the pool. An adult female pointed toward the small private park adjacent to the pool (Casebolt Dec., Apx. p. 4 ¶ 10; Casebolt Dashcam counter 5:00-5:08.

      **Plaintiff's Response:**

      Disputed. Defendant has presented no evidence to support where anyone was pointing.

9.      **Casebolt Allegation No. 9** – Although it cannot be seen on camera, a number of males that had been inside the pool fenced area climbed or jumped over the fence and began running away from Cpl. Casebolt (Casebolt Dec., Apx. p. 4 ¶ 11).

      **Plaintiff's Response:**

      Disputed.  This is allegation is speculative and conclusory. Casebolt has presented

absolutely no evidence to support this claim, other than his own self-serving statements.

10.     **Casebolt Allegation No. 10** – Cpl. Casebolt thought that there may be fighting inside the pool area and that people were trying to get away from him because he was a Police Officer in a marked Police car. Some of the people Casebolt had seen climbing over the fence can be seen on his dashcam (Casebolt Dashcam counter 5:25-5:32; Casebolt Dec., Apx. p. 4 ¶ 11).

      **Plaintiff's Response:**

      Disputed.  This allegation is not fact.  It is speculative and conclusory. Casebolt's thoughts

are not "undisputed facts."

11.     **Casebolt Allegation No. 11** – Members of the crowd, the same males that Casebolt had seen climbing over the fence, were trying to leave the area and Cpl. Casebolt ordered these males to get on the ground because he wanted to investigate their actions. Some of the males that Casebolt ordered to get on the ground did not obey his orders. At least one walked around a corner and did not return. (Casebolt Dec., Apx. p. 4 ¶¶ 11-12; Casebolt Dashcam counter 5:40).

      **Plaintiff's Response:**

      Disputed.  This allegation is not fact. It is speculative and conclusory. Casebolt has

presented absolutely no evidence to support this claim, other than his own self-serving statements.

12.     **Casebolt Allegation No. 12** – Cpl. Casebolt had seen about 100 young people in the area of the pool and park. He was trying to determine if any fighting was going on, he also wanted to keep the crowd from returning to the pool or park area because those were the center of the reported fighting or disturbances. Up to that point, Cpl. Casebolt was the only Police Officer on the scene (Casebolt Dec., Apx. p. 4 ¶¶ 11-12).

   **Plaintiff's Response:**

   Disputed. This allegation is not fact. It is speculative and conclusory. Casebolt has

presented absolutely no evidence to support this claim, other than his own self-serving statements.

13.     **Casebolt Allegation No. 13** – Cpl. Casebolt orders some of the males who had been jumping over the fence to come back to him. He yelled "Hey, get over here!", and a number of the young males in that group began to run away (Casebolt Dec., Apx. p. 5 ¶ 13; Casebolt Dashcam counter 5:30-5:50).

   **Plaintiff's Response:**

   Disputed.  This allegation is not fact. It is speculative and conclusory. Casebolt has

presented absolutely no evidence to support this claim, other than his own self-serving statements.

14.     **Casebolt Allegation No. 14** – Cpl. Casebolt thought that some of the males who were running away were trying to draw him away from the area of the pool. Some of those persons flipped him off. One of the males trotted a distance away and turned and watched Cpl. Casebolt in a way that made Cpl. Casebolt think this person was trying to draw Cpl. Casebolt away from the pool area (Casebolt Dec., Apx. p. 5 ¶ 13).

   **Plaintiff's Response:**

   Disputed.  This allegation is not fact.  It is speculative and conclusory.

15.     **Casebolt Allegation No. 15** – At this time, Cpl. Casebolt was trying to keep the males he had seen jumping over the fence detained and he was also trying to order people to leave if he had not seen them running or otherwise acting suspiciously. Despite this, a large number of people in the crowd were not leaving (Casebolt Dec., Apx. p. 5 ¶ 14; Casebolt Dashcam counter 5:50-7:29).

   **Plaintiff's Response:**

   Disputed.  This allegation is not fact. It is speculative and conclusory. Casebolt has

presented absolutely no evidence to support this claim, other than his own self-serving statements.

16.     **Casebolt Allegation No. 16** – While all of this was going on, Cpl. Casebolt could hear a lot of yelling, mostly female voices, and this added to the confusion and distracted him

from trying to find out what was going on in the area of the park and the pool entrance (Casebolt Dec., Apx. p. 5 ¶ 15; Casebolt Dashcam counter 8:00-8:14).

**Plaintiff's Response:**

Disputed.  This allegation is not fact. It is speculative and conclusory. Casebolt has

presented absolutely no evidence to support this claim, other than his own self-serving statements.

17.   **Casebolt Allegation No. 17** – Cpl. Casebolt had received reports from MPD Communications that there had been a fight involving three juvenile individuals fighting an older adult female and one of the people involved in the fight was a black female wearing a bikini with an orange top (Casebolt Dec., Apx. p. 5 ¶ 15; MPD Communication Notes, Apx. p. 16).

**Plaintiff's Response:**

Disputed.  Defendant conveniently omits the rest of the description which includes that the

female was wearing BLACK SHORTS, NOT a bright yellow bikini. (MPD Communication Notes,

Apx. p. 16) (Emphasis added)

18.   **Casebolt Allegation No. 18** – Plaintiff D.B. was wearing a bikini which had an orangish colored top. D.B. is the female seen in videos in a multi-colored bikini with an orangish colored top (Casebolt Dashcam counter 7:05-7:13; YouTube Video counter 1:21-1:27).

**Plaintiff's Response:**

Disputed.  Defendant's statement is self-serving and only includes partial facts to support

his argument.  Casebolt does not include the fact that the description stated that the individual

involved in the fight was wearing black shorts. D.B. was wearing a bright yellow bikini, which

does not fit the description of the female involved in the fight.

19.   **Casebolt Allegation No. 19** – Cpl. Casebolt did not notice any other black female juvenile in a bikini with an orange or orangish top besides D.B. D.B.'s actions before Cpl. Casebolt even approached her made Cpl. Casebolt think that D.B. could be one of the instigators of disturbances or fighting (Casebolt Dec., Apx. p. 6).

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is speculative and conclusory.  In fact, Casebolt's

own statements contradict this allegation.  Casebolt declares in "Undisputed Fact" #15 that he

ordered people to leave "if he had not seen them running or otherwise acting suspiciously."  He

further alleged that D.B. was one of the people he ordered to leave in "Undisputed Fact #20."

20.   **Casebolt Allegation No. 20** – Cpl. Casebolt told the group of girls shown in the video,
including D.B., to "get your ass out of here" at the same time he was handcuffing two males
(YouTube Video counter 1:11-1:18). Cpl. Casebolt gave at least 2 more orders to D.B. and
the group of girls to leave. (YouTube Video counter 2:26-2:28 & 2:35).

   **Plaintiff's Response:**

   Disputed.  Casebolt never made a direct command to D.B.  Casebolt was out of control and

belligerent and yelling profanity at everyone.  It was very unclear to whom his rants and profanity

were directed.

21.   **Casebolt Allegation No. 21** – Several seconds after Cpl. Casebolt ordered her to leave,
D.B. walked right past Cpl. Casebolt immediately adjacent to where he was trying to carry
out the handcuffing of two males and D.B. then walked out into the street and stopped right
past where Cpl. Casebolt was handcuffing the two males (YouTube Video counter 1:21-
1:27).

   **Plaintiff's Response:**

   Disputed.   As indicated in Exhibit D, D.B. was nowhere near Casebolt, nor was she

interfering with his duties.

22.   **Casebolt Allegation No. 22** – D.B. then rejoined a group of girls in bathing suits and the
group appeared to be walking away after Cpl. Casebolt again ordered D.B. to leave. Cpl.
Casebolt thought D.B. had actually left – finally complying with the order to leave he had
repeated several times (Casebolt Dec., Apx. p. 6 ¶¶ 18-19; YouTube Video counter 2:28-
2:50).

   **Plaintiff's Response:**

   Disputed. Casebolt never directly nor specifically ordered D.B. to leave. He was belligerent

and yelling and cursing.

23.   **Casebolt Allegation No. 23** – Even though D.B. had appeared to leave and Cpl. Casebolt
thought she was leaving, D.B. then defied Casebolt's earlier orders by reappearing in Cpl.
Casebolt's view and began walking back toward Cpl. Casebolt instead of leaving
(YouTube Video counter 2:52; Casebolt Dec., Apx. p. 6 ¶¶ 19-20).

**Plaintiff's Response:**

Disputed.  As indicated in D.B.'s Declaration (Exhibit A p. 2 ¶ 12; and YouTube Video, at

2:49 and 2:50) D.B. was leaving the area.  However, she simply turned around to ask a friend to

call her mama, because she had been dropped off and she needed to advise of her location.

24.    <u>Casebolt Allegation No. 24</u> – At this point, Cpl. Casebolt thought D.B. had interfered with
       performance of his duties as a public servant which would be a violation of Texas Penal
       Code § 38.15. Cpl. Casebolt also thought D.B. may have been one of the people involved
       in the fight or involved in instigating disturbances because she had repeatedly disobeyed
       or ignored Casebolt's orders. Cpl. Casebolt did not want D.B. to return to the area where
       he had handcuffed the two males. He was concerned that D.B. might stir up additional
       disturbances or interfere in his efforts to investigate what was going on or interfere in
       efforts to maintain control and order. At that point, Cpl. Casebolt did not see any other
       Officer near enough to assist him (Casebolt Dec., Apx. p. 6 ¶ 20).

       **Plaintiff's Response:**

Disputed.  This is speculative and conclusory.  It is also not supported by Casebolt's own

conflicting statement in "Undisputed Fact" #15 that he ordered people to leave "if he had not seen

them running or otherwise acting suspiciously."   In "Undisputed Fact" #20, Casebolt, further

declared that D.B. was one of the people he ordered to leave.

25.    <u>Casebolt Allegation No. 25</u> – Cpl. Casebolt approached D.B., grasped her arm and began
       walking her back along a sidewalk area. D.B. pulled away from Cpl. Casebolt and as she
       was pulling away from him, she turned in a circle away from Cpl. Casebolt as he was
       holding her arm. Cpl. Casebolt then used an armbar technique to place her on the grass
       (Casebolt Dec., Apx. p. 7 ¶ 21; YouTube Video counter 3:00-3:03).

       **Plaintiff's Response:**

Disputed. At no point was D.B. ever in control of her own movements as Casebolt

outweighed her by at least 100 pounds. Casebolt yanked her from the crowd and immediately

slammed her to the ground. He yanked her back up by her arm. (YouTube Video at 3:00-3:04).

26.    <u>Casebolt Allegation No. 26</u> – D.B. continued to resist Cpl. Casebolt's efforts to control
       her and tried to get up from the grass (Casebolt Dec., Apx. p. 7 ¶¶ 21-22; YouTube Video
       counter 3:05).

**Plaintiff's Response:**

D.B. never resisted.  At no point after Casebolt attacked her was D.B. ever in control of her own movements.  He tossed her around like a rag doll.  Casebolt had a hold of D.B.'s arm.  He yanked her up from the grass. (YouTube Video at 3:04).

27.   **Casebolt Allegation No. 27** – Cpl. Casebolt again used an armbar control technique pushing D.B. back onto the grass, but this time she landed partly on the sidewalk and partly on the grass (Casebolt Dec., Apx. p. 7 ¶ 22; YouTube Video counter 3:05-3:06).

**Plaintiff's Response:**

Disputed.  Casebolt's armbar technique was such that when he yanked D.B. up from the grass, he slammed her onto the concrete so hard that she was airborne. (You Tube Video at 3:05; Declaration of D.B. – Exhibit A at p. 2 ¶ 13; and Exhibit F at p. 24).

28.   **Casebolt Allegation No. 28** – While Cpl. Casebolt was trying to hold D.B. down, she was trying to push herself back up and at the same time, people rushed toward Cpl. Casebolt. A female in a white bikini came so close to Cpl. Casebolt that he pushed her away. A male teenager or young adult rushed Cpl. Casebolt and squatted in a football stance or wrestling stance immediately adjacent to Cpl. Casebolt. Another young male rushed toward Cpl. Casebolt but did not get as close as the male who had squatted (Casebolt Dec., Apx. p. 7 ¶¶ 22-23; YouTube Video counter 3:09-3:12).

**Plaintiff's Response:**

Disputed.  D.B. was not trying to push herself up.  She was writhing in pain from a full-grown man wearing thirty extra pounds of gear, being on top of her. (YouTube Video at 3:09-3:12; Declaration of D.B., Exhibit A at p. 2-3, ¶¶ 14-17)

29.   **Casebolt Allegation No. 29** – Cpl. Casebolt stood up and unholstered his service pistol pointing it in a downward direction. The two males who had rushed him ran away. Cpl. Casebolt reholstered his service handgun after several seconds. He had never pointed it at D.B. (Casebolt Dec., Apx. p. 7 ¶ 23; YouTube Video counter 3:19-3:21).

**Plaintiff's Response:**

Disputed.  Casebolt did in fact point his weapon at the boys who came to check on D.B. (YouTube Video at 3:12).  Casebolt only reholstered his weapon after he was confronted by two

other officers.

30.    **Casebolt Allegation No. 30** – Cpl. Casebolt then began to attempt to move D.B. by standing her up. He had the intention of placing her near the other people who were detained in handcuffs (Casebolt Dec., Apx. p. 7 ¶ 23).

   **Plaintiff's Response:**

   Disputed.  Casebolt never attempted to stand D.B. up. He grabbed her by her arm and threw

D.B. back on the ground. Then he slammed her face into the ground, yelling "On your face!"

(YouTube Video at 3:19 -3:26).

31.    **Casebolt Allegation No. 31** – D.B. would not stand up and her body was loose or limp which caused her to pull away or fall away from Cpl. Casebolt and this caused her to be placed back on the grass (YouTube Video counter 3:22-3:25; Casebolt Dec., Apx. p. 7 ¶ 23).

   **Plaintiff's Response:**

   Disputed.  D.B was seated on the ground.  Casebolt grabbed her by her arm pulled D.B. up

and then threw her back on the ground. Then he slammed her face into the ground, yelling "On

your face!" (YouTube Video at 3:19 -3:26). Casebolt was yelling angrily and did not gently "place"

D.B. anywhere.

32.    **Casebolt Allegation No. 32** – When D.B. was back on the grass, she continued to struggle with Cpl. Casebolt. He tried to move her away from the fence area where Cpl. Casebolt thought he would be less vulnerable (Casebolt Dec., Apx. p. 7 ¶ 23; YouTube Video counter 3:21-3:50).

   **Plaintiff's Response:**

   Disputed.  D.B. was not struggling or resisting. She was writhing in pain from a grown

man being on top of her.  D.B. did whatever Casebolt yelled for her to do. She was afraid that he

would kill her if she did not. Casebolt dragged her across the grass.  (YouTube Video at 3:09-3:12;

and Declaration of D.B., Exhibit A at p. 2-3, ¶¶ 14-17).

33.    **Casebolt Allegation No. 33** – During this, D.B. resisted by lying on her side and disregarding Cpl Casebolt's orders to get on her face or lay face down, and she was

generally trying to push herself off the ground and pull away from him. Part of this struggle can be seen on video (YouTube Video counter 3:21-3:50; Casebolt Dec., Apx. p. 7 ¶ 24).

**Plaintiff's Response:**

Disputed.  D.B. was not struggling or resisting. She was writhing in pain from a grown man being on top of her.  D.B. did whatever Casebolt yelled for her to do. She was afraid that he would kill her if she did not. (YouTube Video at 3:09-3:12; Declaration of D.B., Exhibit A at p. 2-3, ¶¶ 14-17).

34.   **Casebolt Allegation No. 34** – Cpl. Casebolt was concerned about where he could place his hands on D.B. because she was a female in a bikini and he therefore felt limited on where he would put his hands on her body to control her. He therefore primarily used his hands to make contact with her arm or shoulder or head or neck area (Casebolt Dec., Apx. p. 9 ¶ 30; YouTube Video counter 3:21-4:00).

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is subjective and speculative.  Casebolt's actions as shown on the YouTube Video demonstrates his callous disregard for D.B.'s well-being. If Casebolt had been remotely concerned about his treatment of D.B. he would never have handled a non-threatening, non-criminal 100-pound school girl with such excessive force.

35.   **Casebolt Allegation No. 35** – Cpl. Casebolt had used his two sets of handcuffs on the two males that he had handcuffed shortly before his encounter (Casebolt Dec., Apx. p. 7 ¶ 25; YouTube Video counter 1:11-1:27). For these reasons, and because D.B. was wearing a bikini, when Cpl. Casebolt was trying to maintain control over D.B. without handcuffs available, at first he placed both knees on D.B.'s back – for about 9 seconds both of his knees were on her back (YouTube Video counter 3:50-3:59; Casebolt Dec., Apx. p. 7 ¶ 25 and p. 9 ¶ 30).

**Plaintiff's Response:**

Disputed.  D.B. did not resist. Even when Casebolt rushed away to try to shoot the boys who had approached, D.B. did not attempt to flee or even stand up. She simply sat there and cried and begged for someone to call her mother. (YouTube Video 3:11-3:19).

36. **Casebolt Allegation No. 36** – When D.B. stopped struggling as much, Cpl. Casebolt moved one of his legs off her back but keeping one leg on or over her back (Casebolt Dec., Apx. pp. 7-8 ¶ 25; YouTube Video counter 3:59-4:01).

   **Plaintiff's Response:**

   Disputed.  D.B. was not struggling or resisting. She was writhing in pain from a grown

man being on top of her.  D.B. did whatever Casebolt yelled for her to do. She was afraid that he

would kill her if she did not. (Declaration of D.B., Exhibit A at p. 2-3, ¶¶ 14-17)

37. **Casebolt Allegation No. 37** – D.B. was crying. At one point, Cpl. Casebolt told D.B. "You're going to jail if you don't knock it off." (YouTube Video counter 5:12). Shortly after this, D.B. calmed down and Cpl. Casebolt removed his right knee from her and kneeled next to her. None of Cpl. Casebolt's knees were on D.B. after this. (Casebolt Dec., Apx. p. 8 ¶¶ 25-26; YouTube Video counter 5:23-5:24).

   **Plaintiff's Response:**

   Disputed. D.B. was not struggling or resisting. She was writhing in pain from a grown man

being on top of her.  D.B. did whatever Casebolt yelled for her to do. She was afraid that he would

kill her if she did not. Casebolt continued his unlawful assault on D.B. by threatening to arrest and

imprison her for CRYING during his attack. (Declaration of D.B., Exhibit A at p. 2-3, ¶¶ 14-17).

38. **Casebolt Allegation No. 38** – Cpl. Casebolt directed D.B. to put her hands on her lower back because he still did not have handcuffs. At this point, D.B. complied with the direction (Casebolt Dec., Apx. p. 8 ¶ 26; YouTube Video counter 5:27). D.B. generally kept her hands in this position until she was handcuffed about one minute later by another Officer (Casebolt Dec., Apx. p. 8 ¶ 26; YouTube Video counter 6:23).

   **Plaintiff's Response:**

   Disputed.  At no point was D.B. non-compliant. D.B. did whatever Casebolt yelled for her

to do. She was afraid that he would kill her if she did not. (Declaration of D.B., Exhibit A at p. 2-

3, ¶¶ 14-17).

39. **Casebolt Allegation No. 39** – After D.B. was handcuffed, she was moved from the ground to a seated position and then to a low stone wall where she was allowed to sit upright in a more comfortable position. (This is not captured on video.) (Casebolt Dec., Apx. p. 8 ¶¶ 26-27).

**Plaintiff's Response:**

Disputed.   At no point throughout this assault was D.B. made comfortable.   She was

terrified, in pain, and was hyperventilating.   Declaration of D.B., Exhibit A at p. 3, ¶ 19).

40.     **Casebolt Allegation No. 40** – At that point, Cpl. Casebolt attended to other duties while
        another Officer – his supervisor Sgt. Shanley – watched over D.B. (Casebolt Dec., Apx. p.
        8 ¶ 27). (See generally Casebolt Dashcam counter 13:38-end.)

        **Plaintiff's Response:**

        Disputed.  This allegation is not fact. It is conclusory and speculative.

41.     **Casebolt Allegation No. 41** – Cpl. Casebolt was having trouble breathing. The
        combination of a hot day, his physical exertions, his heavy equipment including a bullet-
        resistant vest, caused him to have difficulty breathing. He went to an ambulance about 22
        minutes after he first arrived on the scene (Casebolt Dec., Apx. p. 8 ¶¶ 27-28; Casebolt
        Dashcam counter 27:00-27:10).

        **Plaintiff's Response:**

        Disputed.  This allegation is not fact.  It is speculative.  Casebolt has presented no evidence

other than his own self-serving statements.

42.     **Casebolt Allegation No. 42** – In the ambulance, he was given treatment including
        intravenous fluids, connection to a heart monitor, and other examination. Because he had
        an elevated heart rate and felt dizzy, he was eventually transported to a hospital after
        spending over an hour in the ambulance at the scene (Casebolt Dec., Apx. p. 8 ¶ 28).

        **Plaintiff's Response:**

        Disputed. This allegation is not fact.  It is speculative.  Casebolt has presented no evidence

other than his own self-serving statements.

43.     **Casebolt Allegation No. 43** – Cpl. Casebolt estimates that he went to the paramedics in
        the ambulance for assistance about 20-30 minutes after he had first arrived on the scene.
        His dashcam has audio recordings capturing his difficulty breathing (Casebolt Dashcam
        counter 7:10-27:10). Casebolt told one of the Officers that he was going to get some air
        (Casebolt Dashcam counter 27:10). This would be at about the point Casebolt has estimated
        that he went to the ambulance since he arrived on the scene at Casebolt Dashcam counter
        5:00, and this took place at Casebolt Dashcam counter 27:10 – about 22 minutes later.

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is speculative.  Casebolt has presented no evidence other than his own self-serving statements.

44.   **Casebolt Allegation No. 44** – While Cpl. Casebolt was in the ambulance at the scene and before he was taken from the scene, his supervisor spoke to Casebolt about releasing D.B., and she was released at about that time. D.B.'s release was handled by other Officers (Casebolt Dec., Apx. p. 8 ¶ 27).

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is speculative.  Casebolt has presented no evidence other than his own self-serving statements.

45.   **Casebolt Allegation No. 45** – D.B. was allowed to leave the scene with an adult relative – Cpl. Casebolt thought it was D.B.'s grandmother or mother. This was less than an hour after D.B. was first handcuffed (Casebolt Dec., Apx. p. 8 ¶ 27).

**Plaintiff's Response:**

Disputed.  This allegation is not fact.  It is speculative. Casebolt's "thoughts" are not "undisputable facts."

## V.   STANDARDS FOR ANALYZING QUALIFIED IMMUNITY

### A.   Two Prongs of Federal Qualified Immunity Analysis

This Court must undertake a two-pronged inquiry to evaluate Casebolt's claim of qualified immunity.[28] The first question is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[29] The second prong inquires "whether the right was clearly established" at the time of the alleged misconduct.[30] The test to determine if the right was clearly established is "whether it would be clear to a

---

[28] The Supreme Court of the United States has held that the prongs can be addressed in either order. *See Geils v. Patin*, 941 F. Supp. 2d 722, 727 n.5 (N.D. Tex. 2012) (Boyle, J.) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)).
[29] *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled in part by Pearson,* 555 U.S. at 231.
[30] *Id*. at 201.

reasonable officer that the conduct was unlawful in the situation he confronted."[31] If a reasonable jury could conclude that an officer is "plainly incompetent" or "knowingly violates the law," he is not entitled to qualified immunity.[32]

Because qualified immunity is an affirmative defense, the burden shifts to nonmovant to rebut entitlement to it.[33] Summary judgment should be denied if there is a genuine question of material fact as to whether or not the police officer reasonably believed that the suspect posed an immediate and significant threat to anyone.[34]  Summary judgment is not proper if the nonmovant can point to evidence that contradicts the moving party's version of events.[35]

Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."[36]

## B.      Texas Official Immunity Analysis

In similar cases, Texas courts have adopted an official immunity analysis which is essentially the same as that of the Federal Courts.[37]

## C.      Plaintiff's Summary Judgment Burden

As the summary judgment movant, Casebolt bears the burden of demonstrating an absence of evidence to support the non-movant's case.[38] In other words, if this Court concludes that a genuine issue of fact exists with regard to Plaintiff's causes of action that are the subject of

---

[31] *Id*. at 202.
[32] *Id*. (citing *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).
[33] *Id*.
[34] *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. Tex. 2004).
[35] *Tolan v. Cotton*, 713 F.3d 299, 306-307 (5th Cir. Tex. 2013) ("[t]he Fifth Circuit has . . . refused to allow a nonmovant to defeat summary judgment where, as here, he or she 'points to nothing in the summary judgment record that casts doubt on the veracity of the [witness's] version of the events.'"). That Pailet's narrative is the only full account does not per se cast doubt on its veracity; the plaintiffs must offer or point to other evidence that contradicts or undermines his account; skepticism is insufficient. See *Ontiveros*, 564 F.3d at 383")
[36] *Bazan v. Hidalgo County*, 246 F.3d at 491; *citing Gooden v. Howard County, Md*., 954 F.2d 960, 971 (4th Cir. 1992).
[37] *Cantu v. Rocha*, 77 F.3d 795, 804 (5th Cir. 1996); *Haggerty v. Texas Southern University*, 391 F.3d 653, 658 (5th Cir. 2004); *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2013).
[38] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Casebolt's motion, he is not entitled to summary judgment on those claims.[39] A genuine issue of material fact exists where the evidence is such that a reasonable jury could return a verdict for the non-moving party.[40]

When considering the merits of Casebolt's Reassserted Motion for Summary Judgment, this Court must accept the evidence offered by Plaintiff as true, and all justifiable inferences are to be drawn in Plaintiff's favor.[41] With regard to the evidence that is favorable to Plaintiff, a court should be more lenient in allowing evidence that is admissible, although it may not be in admissible form.[42] Finally, Plaintiff may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.[43]

A court should resolve doubts in favor of the nonmoving party (Plaintiffs in this case) and make all reasonable inferences in favor of that party.[44]  "The court must disregard all evidence favorable to movant that the jury is not required to believe, giving credence to the evidence favoring nonmovant that is uncontradicted and unimpeached, at least to the extent the evidence is from disinterested witnesses."[45]

## VI.    ARGUMENTS AND AUTHORITIES

Defendant requests that the Court violate well-established precedent by requesting that the Court "disregard the allegations in the Complaint."[46]  Defendant further asserts that this Court must accept the facts alleged in his motion as "undisputed" is entirely unsupported. As noted in the preceding section, when ruling on a motion for summary judgment, this Court must accept the

---

[39] Fed. R. Civ. P. 56.

[40] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[41] *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam).

[42] *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir.1988).

[43] *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir. 1990); *Isquith v. Middle South Utilities, Inc*., 847 F.2d 186, 198–200 (5th Cir. 1988).

[44] *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006).

[45] *E.g., Bazan v. Hidalgo County*, 246 F.3d 481, 492 (5th Cir. 2001).

[46] Doc. 14 at p. 23.

evidence offered by Plaintiff as true, and must draw all justifiable inferences in Plaintiff's favor.[47]

Defendant Casebolt alleges three "issues to be decided" in his Reasserted Motion for Summary Judgment. They are as follows:

**ISSUE NO. 1**

> **BECAUSE D.B. SUED BOTH THE CITY OF MCKINNEY AND CPL. CASEBOLT UNDER TEXAS LAW, CAN SHE AVOID THE IMMEDIATE IRREVOCABLE STATUTORY BAR OF TEX. CIV. PRAC. & REM. CODE § 101.106 AND PROCEED WITH TEXAS LAW CLAIMS AGAINST CPL. CASEBOLT FOR FALSE ARREST, ASSAULT AND BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS?**

Plaintiff will show this court that YES, she can proceed with her Texas state claims, for the foregoing reasons:

Plaintiff's First Amended Complaint asserts no claims against the City of McKinney under Texas state law. Defendant Casebolt mischaracterized Plaintiff's claims. All claims under Texas law (specifically Counts V, VI, and VII) are solely against Defendant Casebolt. Alternatively, if the Court finds that the Original Complaint is the operative document for this analysis, Casebolt's claim of immunity was not perfected. And finally, even if this Court finds that all claims under Texas state law must be attributed to McKinney, Plaintiff can still demonstrate that McKinney is liable.

**A.    The Court Must Determine that Plaintiff's Texas Law Claims Arise From Casebolt's Performance in the Scope of His Duties.**

Plaintiff concedes that Texas claims against Casebolt arise from Casebolt's performance in the scope of his duties.

**B.    Plaintiff Made an Immediate Irrevocable Statutory Election.**

Pursuant to this Court's Order issued May 16, 2017 (Doc. 49) granting Plaintiff Leave to

---

[47] *Tolan*, 134 S. Ct. at 1863.

Amend her Complaint, Plaintiff amended her Complaint accordingly on May 23, 2017 (Doc. 50).

The Court's Order (Doc. 49) also mooted Casebolt's first Motion for Summary Judgment (Docs.

14 and 14-1).   Therefore, Plaintiff's live pleading is Plaintiff's First Amended Complaint (Doc.

50), which fully replaces Plaintiff's Original Complaint (Doc. 1).

### 1.      Plaintiff's First Amended Complaint Does Not Assert Any Texas State Claims Against McKinney.

Plaintiff's First Amended Complaint asserts no claims against the City of McKinney under

Texas state law.   Defendant Casebolt's Motion mischaracterizes Plaintiff's claims.   All claims

under Texas law, False Arrest (Unlawful Detention), Assault and Battery, Gross Negligence, and

Intentional Infliction of Emotional Distress, are asserted solely against Defendant Casebolt under

applicable Texas State Law.   The First Amended Complaint specifically asserts:  "This is an action

brought by the Plaintiff against The City of McKinney for excessive force and false arrest, and

*Eric Casebolt negligence, gross negligence, assault/battery, intentional infliction of emotional*

*distress*. (Doc. 50 ¶ 1) (emphasis added).

All claims against McKinney (including Negligent Hiring) are asserted pursuant to 42

U.S.C. § 1983.   Section 101.106 requires the plaintiff to make an irrevocable election between

"suing the governmental unit under the Tort Claims Act" if the employee acted within the scope

of his employment "or proceeding against the employee alone" if he acted independently. But that

election did not extend to section 1983 claims against the individual Employees that were not

brought under the Tort Claims Act and thus were not otherwise subject to dismissal.[48]

### 2.      Claims against Defendant are not subject to Immediate Dismissal.

In the event that this Court finds that the Plaintiff's Original Complaint is the operative

document for this analysis, Defendant is still not entitled to dismissal.   The Texas Tort Claims Act

---

[48] *Mission Consolidated I.S.D. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008)

provides: "If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit."[49]    No such motion has been filed by McKinney.   Therefore, Defendant Casebolt's claims should not be dismissed.

**C.    Casebolt is Not Statutorily Immune to Claims Within the General Scope of His Duties.**

While government employees enjoy immunity for certain actions which occur during the scope of their employment, The Texas Tort Claims Act specifically excludes intentional torts.  In fact, it expressly excludes and does not provide immunity for the very claims asserted against Defendant Casebolt. The Act states "This chapter does not apply to a claim…arising out of assault, battery, false imprisonment, or any other intentional tort."[50]  Therefore, Casebolt is not entitled to immunity, and consequently Plaintiff's claims against him should not be dismissed.

**D.    Plaintiff's Intentional Infliction of Emotional Distress (IIED) Is a Viable Claim Against Defendant Casebolt.**

Defendant Casebolt contends that there was nothing "there is nothing extreme or outrageous" about his conduct.  Casebolt is an adult male weighing close to 200 pounds without the 30 pounds of extra gear he asserts that he was wearing at the time of the attack. Casebolt picked up a 100 pound child and slammed her on concrete. He repeated picked her up and threw her back on the ground.  He then pulled a gun on her friends.  Casebolt's behavior actually violated Texas Penal Code Sec. 22.01. And to add insult to injury, the entire assault was broadcast for months across the entire globe. Casebolt's own boss at the time called Casebolt's behavior as "out of control" and "indefensible."[51] Casebolt's conduct was ridiculously extreme and outrageous by any

---

[49] TEX. CIV. PRAC. & REM. CODE § 101.106
[50] TEX. CIV. PRAC. & REM. CODE § 101.057
[51] Exhibit H – Chief Greg Conley Press Conference Video at 0:18-0:31

objective standard. Therefore, a claim for Intentional Infliction of Emotional Distress is sustainable.

## ISSUE NO. 2

**IN CONNECTION WITH HER FALSE ARREST CLAIM, UNDER THE TOTALITY OF CIRCUMSTANCES FACING CPL. CASEBOLT, CAN D.B. CARRY HER BURDEN OF ESTABLISHING A FOURTH AMENDMENT VIOLATION OR FALSE ARREST UNDER TEXAS LAW IN ORDER TO OVERCOME CPL. CASEBOLT'S QUALIFIED IMMUNITY OR IMMUNITY UNDER TEXAS LAW?**

## A.     Probable Cause

**Legal Standard**

The Fifth Circuit makes it clear that the constitutional torts of false arrest, unreasonable seizure and false imprisonment require a showing of *no probable cause*.[52] Texas also requires Plaintiff D.B. to show that her arrest or detention was carried out by Casebolt without probable cause in order to establish a civil claim for false arrest.[53]

Although Casebolt does not concede that D.B. was arrested, he certainly intended to detain her.[54]. Nonetheless, for summary judgment purposes, it is not material for the Court to determine whether D.B. was detained or instead arrested.  D.B. can establish the absence of probable cause in order to prevail on her Fourth Amendment claim regardless of whether or not she was detained or arrested.  Casebolt violated D.B.'s Fourth Amendment rights by unlawfully detaining her or arresting her.

Plaintiff demonstrates that there are numerous issues of material fact related to probable cause.  Probable cause exists when the totality of the facts and circumstances within a Police

---

[52] *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001); *Haggerty v. Texas Southern University*, 391 F.3d 653, 656 (5th Cir. 2004).
[53] *Villegas v. Griffin Industries*, 975 S.W.2d 745, 753, 754 (Tex. App. – Corpus Christi 1998, review denied)
[54] Casebolt Declaration, Apx. p. 8 ¶ 26.

Officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.[55]

**Reasonable Suspicion**

Casebolt's Reasserted Motion for Summary Judgment alleged a lower standard of "reasonable suspicion" Casebolt asserts that instead, when considering the totality of the circumstances known to the officer, if the officer has a particularized and objective basis for suspecting legal wrongdoing, this is all that is required to establish reasonable suspicion justifying an investigatory detention short of a traditional arrest. Casebolt and bases his alleged reasonable suspicion that on alleged violations of Texas Penal Code § 38.15.

Casebolt's argument of reasonable suspicion, even with its lowered standard, still fails. Casebolt had absolutely no reason to suspect D.B. of any legal wrongdoing.  In fact, he did not suspect her of wrongdoing at the time, because, according to Casebolt's own statements, he declares in "Undisputed Fact" #15 that he ordered people to leave "if he had not seen them running or otherwise acting suspiciously."  He further alleged that D.B. was one of the people he ordered to leave in "Undisputed Fact #20."[56]  Therefore, if Casebolt's own words are taken as true undisputed facts, he ordered D.B. to leave because he did not suspect her of any violations.

D.B. was leaving the scene when Casebolt attacked her.  He walked approximately 20 feet to get to her.  Under the circumstances there was absolutely no reasonable suspicion that D.B. had was committing any type of violation.

**Alleged Violation of Texas Penal Code § 38.15**

Casebolt's Reasserted Motion for Summary Judgment alleges that D.B. violated Texas Penal Code § 38.15. Texas Penal Code § 38.15 creates an offense for interference with public

---

[55] *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001); *Haggerty*, 391 F.3d at 656-657.
[56] Casebolt Motion p. 5.

duties.  In relevant part, § 38.15 provides:

> "(a) A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a Peace Officer while the Peace Officer is performing a duty or exercising authority imposed or granted by law; (2) a person who is employed to provide emergency medical services, including the transportation of ill or injured persons while the person is performing that duty…".

In his motion, Casebolt alleges that he had probable cause to detain D.B. for violation of Texas Penal Code §38.15.  However, this argument fails. Miserably.  According to Casebolt's own evidence proffered, (YouTube Video) at no point in time did D.B. interrupt, disrupt, impede, or otherwise interfere with Casebolt's duties.  At no point before she was attacked did D.B. directly interact with Casebolt.   In fact, when Casebolt began his assault on her, he had to walk approximately fifteen to twenty feet to come attack her.[57]  D.B. was nowhere near Casebolt. Nor was she interfering with his duties.[58]

**Distinguishable Case Law Cited by Defendant**

Defendant Casebolt makes a feeble attempt to liken this case to that of *Spencer v. Rau*.[59] However, that case is totally distinguishable. In *Spencer*, the plaintiff specifically engaged in dialogue with the officer who gave her a direct command to leave the scene.  She left the scene then returned.  She shoved and broke free of the Officer's attempt to make a lawful arrest.

In the instant case, Casebolt never spoke directly to D.B.  Casebolt was "out of control" and belligerent. He was acting very erratically.  Casebolt was yelling profanity at any and every one and no one in particular.  Also, Casebolt does not contend that he ever attempted to arrest D.B.

Casebolt would like for this Court to believe that a 100-pound school girl spun him, an adult male (wearing an extra 30 extra pounds of gear) around in a circle, which caused him to have

---

[57] YouTube Video at 2:50.
[58] Declaration of D.B., Exhibit A at p. 2 ¶ 12; and Exhibit D.
[59] *Spencer v. Rau*, 542 F.Supp.2d 583 (W.D. Tex. 2007)

to use force.  This is absolutely false.  It completely contradicts the video evidence which shows Casebolt picking D.B. up and slamming her on the concrete after he swung HER around in a circle.[60]

Casebolt also alleged that D.B. struggled as he was pinning her.  Casebolt yelled conflicting orders. He yelled, "Get on the ground!" while D.B. was still seated on the ground.  Then he proceeded to yank her up by her arm and slam her back on the ground and yelled "On your face!"[61] D.B. tried as best she could to obey Casebolt's commands because she was terrified that he would kill her if she did not.[62]  Moreover, D.B. declares that she was not struggling, but writhing in pain due to having the weight of a full-grown man (plus an extra 30 pounds of gear) on top of her.[63]

Defendant also cites *Haggerty* as analogous to the instant case.[64] *Haggerty* is distinguishable as well.  In that case, the Plaintiff directly approached the Officer and specifically requested that the officer cease his actions.

However, in this case, Casebolt was out of control and yelling and cursing at various people.  He never directly ordered D.B. to do anything before he attacked her. D.B. never approached Casebolt.  D.B. never requested or demanded that Casebolt not perform his official duties as an officer.  Although D.B. walked on the sidewalk near Casebolt, she did not directly approach him, nor did she speak to him, nor did she gesture toward him or make any effort whatsoever to interfere in his duties.[65]  Casebolt does not even make the assertion that D.B. engaged in any actions of the sort. Furthermore, his duties were not, in fact, ever interrupted by D.B. He proceeded in performing his "duties" without interference.

---

[60] YouTube Video at 3:05.
[61] *Id*. at 3:20 -3:25.
[62] Exhibit A at p. 3 ¶ 16.
[63] *Id*. at ¶ 17.
[64] *Haggerty v. Texas Southern University*, 391 F.3d 653 (5th Cir. 2004).
[65] YouTube Video at 1:18 – 1:32.

Therefore, Casebolt's allegation that D.B. committed a violation of Texas Penal Code § 38.15 fails.  Based upon this failure, there was no probable cause nor reasonable suspicion to detain or arrest D.B.

## A.    CASEBOLT VIOLATED CLEARLY ESTABLISHED LAW

Plaintiff has satisfied his obligation to plead an underlying claim of a violation of a constitutional right.  In the first numbered paragraph of her Complaint, Plaintiff alleges the following:

> This is an action brought by the Plaintiff against The City of McKinney and Eric Casebolt for Officer Eric Casebolt's individual use of excessive force, assault, unlawful detention resulting in the injuries to minor child, D.B. under the color of law in violation of her individual rights under the Fourth Amendment of the United States Constitution and in violation of her civil rights pursuant to 42 U.S.C. § 1983.[66]

In sum, Plaintiff has identified a viable theory of recovery under the Fourth Amendment., which was "clearly established" at the time of Casebolt's misconduct.

"Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" [67] While this Court's case law "'do[es] not require a case directly on point'" for a right to be clearly established, " 'existing precedent must have placed the statutory or constitutional question beyond debate.'"[68]  In other words, immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'"[69]

### 1.    Particularized Facts

Contrary to Defendant's assertions, the Court places no obligation on the Plaintiff to cite case law with an identical set of facts.  Each case is unique. The absence of a case "on point" does

---

[66] Doc. #1 at p. 1.
[67] *Mullenix v. Luna,* 577 U.S., at —— – ——, 136 S.Ct., at 308.
[68] *Id.,* at ——, 136 S.Ct., at 308.
[69] *Ibid.*

not absolve an Officer of wrongdoing.[70]  It does not grant carte blanche immunity to any officer who takes it upon himself to violate citizens' rights in a novel or unique way what has not yet been addressed by the court.  Instead, established law means that existing precedent must have placed the statutory or constitutional question beyond debate.[71]

It is clearly established and well beyond debate that detaining or arresting someone with no probable cause is a violation for the Fourth Amendment.  That does not change under the particular set of circumstances of this case.

The particularized facts of this case are as follows:

    a.  At the time Defendant unlawfully detained D.B., he was a police corporal.

    b.  Defendant had over 10 years' experience.

    c.  Defendant asserts that he was properly trained.

    d.  Defendant was called to an event involving CHILDREN.

    e.  By the time Casebolt arrived on the scene, the reported "fight" had ended.

    f.  There was no violent activity.

    g.  D.B. was never accused of nor participated in any violent activity.

    h.  There were several groups of kids who were either standing still or walking around talking.

    i.  None of them were suspected or actually engaged in any criminal activity.

    j.  Yet Casebolt detained almost EVERY black male he encountered.

    k.  Casebolt cursed and screamed orders randomly at various different groups of black children.

    l.  D.B. never personally encountered Casebolt until he assaulted her.

    m.  D.B. never approached or interacted with Casebolt.

---

[70]*Mullenix v. Luna*, 136 S.Ct. at 308
[71] *Id*.; *White*, 137 S.Ct. at 551.

n.   D.B. never engaged in conversation with Casebolt.

o.   Casebolt walked several feet to get to D.B. before he attacked her.

p.   D.B never made a threatening gesture.

q.   D.B. never attempted to flee.

r.   D.B. was never accused of, nor charged with a violation of the law. (That is, until the Defendant needed a justification for immunity in his brief.)

Under the particularized facts of this case, a self-proclaimed "well trained" officer with a decade of experience encountered a girl who was not committing, nor accused of a crime, should have been on sufficient notice that it would be a blatant violation of her Fourth amendment right to utilize force against her and detain her.

The girl did not ever approach the officer, or speak directly to him, or attempt to interrupt his belligerent profanity laced rants, nor his erratic violent racist attacks. Yet, the officer walked across the park to grab her and immediately began assaulting her.  He threw her on the ground. He picked her up by her arm and slammed her on the concrete. And then dragged her to the ground and put his knee on her neck to detain her.

As a trained law enforcement officer Casebolt knew that assaulting a child was a violation of Texas law[72] and that unlawfully and forcefully detaining someone who has committed no crime is a violation of one's rights under the U.S. Constitution.[73]  Casebolt's actions demonstrate that he was either clearly incompetent and/or knowingly violated the law.  Either way, he is not entitled to immunity.

---

[72] Texas Penal Code § 22.01
[73] U.S. Const. Amend. IV

**PLAINTIFF'S RESPONSE TO DEFENDANT CASEBOLT'S
REASSERTED MOTION FOR SUMMARY JUDGMENT**                    **Page 32**

### 2.    Reasonableness

A well-trained officer under circumstances where he encountered a child who was not committing, nor suspected of committing a crime, would not have found it reasonable to have acted the same manner as Casebolt.  In fact, none of the other eleven officers who responded to the scene acted in the same or an even similar manner as Casebolt.  Other officers on the scene were calmly talking to the youth in an attempt to ascertain exactly what was going on. In contrast, Eric Casebolt barreled onto the scene completely out of control.  Casebolt immediately began yelling and screaming and swearing at the minor children.  He proceeded to harass and detain as many black children as he could.

Instead taking the time to ascertain what was going on, and improving the situation, Casebolt made a confusing situation chaotic.  He made it much worse. Casebolt made it volatile. He did not take any time to survey the scene.  Casebolt was so emotionally charged that he actually stumbled and barrel-rolled onto the scene yelling and cursing.  He did not take a moment to even listen to what any of the children had to say.  The kids were trying to explain numerous things, like the fact that they had not driven to the location, or that they could not find their belongings, or that they needed to contact a parent.  But Casebolt refused to listen.  He specifically yelled "I don't care!" numerous times as the children attempted to reason with him.  Casebolt continued swearing and yelling conflicting commands to any and everyone and to no one in particular.

While Casebolt detained almost every black male he encountered, he threatened to arrest the black girls for "running their mouths."  As annoying as their chatter may have been to Casebolt, they had the First Amendment right to speak.   They were not committing a crime for exercising their right to free speech.  Regardless, just a moment after Casebolt's last threat to arrest the girls for talking, he targeted D.B. who was still talking loudly and asking a friend to call her mother.

"You!" he screamed as he came toward her with his baton raised. At the time, D.B. had been walking away and had turned to ask a male friend behind her to call her mother. She had been dropped off and no way to leave the scene if she couldn't call someone. Casebolt advanced toward her and began his assault.

He picked her up and slammed her on the ground several times, once on the concrete.[74] Yet, throughout his motion, Casebolt uses the term "placed" as if he was gently laying a baby to rest. There was absolutely nothing gentle about his approach to this entire situation. Casebolt's own superior characterized Casebolt's actions at "out of control" and "indefensible."[75]

It has been clearly established for centuries that the Fourth Amendment grants a right to be free from unlawful detention/arrest.[76] An arrest or detention is unlawful when there is an absence of probable cause.[77] As discussed above, Casebolt had absolutely no probable cause to detain D.B.

There are numerous genuine issues of material fact in this case as it relates to probable cause and the reasonableness of Casebolt's actions. The veracity of Casebolt's allegations in his motion are completely inconsistent with the video evidence. Casebolt's actions violate the Fourth Amendment right against unlawful arrest. This right is clearly established and has been for centuries. Therefore, Defendant's Reasserted Motion for Summary Judgment on the unlawful arrest claim should be denied.

---

[74] Exhibit G; YouTube Video at 3:01, 3:05, 3:23, 3:25; and 3:30.
[75] Exhibit H, (Police Chief Conley Press Conference Video at 0:18-0:45).
[76] U.S. CONST. AMEND. IV
[77] *Glenn v. City of Tyler*, at 313.

ISSUE NO. 3

IN CONNECTION WITH HER EXCESSIVE FORCE CLAIM, UNDER THE TOTALITY OF CIRCUMSTANCES FACING CPL. CASEBOLT, CAN D.B. CARRY HER BURDEN OF ESTABLISHING A FOURTH AMENDMENT VIOLATION OR ASSAULT AND BATTERY UNDER TEXAS LAW IN ORDER TO OVERCOME CPL. CASEBOLT'S QUALIFIED IMMUNITY OR IMMUNITY UNDER TEXAS LAW?

Casebolt is not entitled to qualified immunity as a matter of law on Plaintiff's excessive-force claim for the foregoing reasons:

A.    QUALIFIED IMMUNITY

To establish a claim of excessive force under the Fourth Amendment, Plaintiff must demonstrate: "(1) an injury that (2) resulted directly and only from a use of force that was excessive to the need and that (3) the force used was objectively unreasonable."[78] Here, Casebolt does not dispute that D.B. suffered an injury that resulted directly and only from the use of force that was excessive to the need.

Totality of Circumstances

Casebolt relies upon the precedent established in *Graham v. Connor*.[79]  Whether the amount of force used in making an arrest is objectively unreasonable requires consideration of the totality of the circumstances present, and must take into account the fact that Police Officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.[80]

However, in the instant case, there was no split second decision to be made.  When Casebolt began his assault on D.B. she was leaving the scene. She was not violating any laws. She was not interfering with his duties, nor was she posing any threat to Casebolt or anyone else on the scene.

---

[78] *Geils*, 941 F. Supp. 2d at 727 (citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)).
[79] *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[80] *Id*. at 396-397

Casebolt simply came after her because he was emotionally charged from a previous call and wanted to take out some of his frustration.  He was upset that D.B. would not stop "Running her mouth."

Given the totality of circumstances, even under *Graham*, the Court will find that Casebolt's actions were not only excessive, but that they were malicious or grossly negligent and particularly egregious.

### 1.      Level of Force Used was Excessive Under the Circumstances

Defendant requests that the Court disregard D.B.'s pleadings and view the video as evidence of the level of force that was used.  However, Plaintiff respectfully requests that the Court considers ALL of the evidence presented, including the First Amended Complaint and its Exhibits. Casebolt alleges that "Putting D.B. on the ground and holding her because she struggled was not excessive." This is a gross mischaracterization of what actually happened.

In the video, as well as Exhibit D below, Casebolt is seen walking approximately 20 feet



to assault D.B., who was walking away from the scene.  Casebolt immediately grabbed D.B.'s arm and swung her around and threw her to the ground.  He then yanked D.B. up from the ground so hard that she was airborne when he slammed her on the concrete.  She landed with such force that you can actually hear her body hit the ground.  This is not "putting" someone on the ground.

But Casebolt's assault did not stop there.  He took a moment from brutalizing D.B. to pull his gun on a few of her concerned friends. All the while D.B. was just sitting between the Craig Ranch Community Manager's legs, crying and pleading for someone, anyone, to "CALL MY MAMA!" D.B. was not resisting. D.B. was not struggling. She was not attempting to flee. She was



simply sitting on the ground in one spot. Crying. And begging for her mama. Yet Casebolt contends D.B. was resisting. As the image from the video below indicates, D.B. was still seated in



the same spot that Casebolt had left her. She was just sitting there. Not struggling. Not resisting. She was simply crying. And desperately begging for her mother.

Casebolt alleges "putting D.B. on the ground and holding her because she struggled was not excessive."  However, as the images from the video below indicate, D.B. was not struggling. She was already sitting on the ground. She was crying and pleading for someone to call her



"Mama." Despite the fact that D.B. was not resisting nor struggling, but was compliant and just sitting on the ground crying, Casebolt grabbed her by the arm, violently yanked her up from the ground, swung her around, threw her back on the ground, and slammed her face into the grass and yelled "On your face!"  This is not "putting" D.B. on the ground "because she was struggling."

After he slammed D.B.'s face into the grass, Casebolt then dragged her across the ground. Then Casebolt sat on top of D.B.! He thrust one knee into D.B.'s back and one on her NECK.



This is not "holding" D.B.  Casebolt put his full body weight plus thirty extra pounds of gear onto the neck and back of a non-threatening, 100-pound school girl, who was wearing the

equivalent of undergarments.  Casebolt alleges that it was not excessive to grab a child by the arm, slam her onto the concrete sidewalk, yank her up from the ground, toss her around and slam her back on the ground.

The video evidence clearly indicates that Casebolt's allegations regarding his justification for detaining and utilizing such brutal force against D.B. are blatantly false.  Simply put, Casebolt threw a little girl on the ground and sat on her. Period. She was not struggling. She was not committing a crime. She was crying and begging for her mama.  This is absolutely excessive.

### 2. No Court Has Held That Similar Uses of Force Was Not Excessive.

Under no circumstances would this type of vicious assault AGAINST A HARMLESS FEMALE CHILD not be considered excessive. In fact, an ordinary citizen would have been arrested had they committed these same violent acts against their own child.

Casebolt makes a feeble attempt to make compare non-jurisdictional cases involving adults who were suspected of committing crimes or violating the law. None of cases are even remotely analogous to utilizing brutal force against a child who was an invited guest to a pool party.  And even if any of the cases were analogous, none are controlling because none of the cases referenced are even in this jurisdiction.  However, for the sake of analysis:

***Britschge v. Harmison***

Casebolt cites *Britschge v. Harmison* as justification for his use of force.[81]  In that case, an officer approached a crowd that was gathered around a parked vehicle.  The officer observed alcohol in the vehicle and requested that the Plaintiff unlock the door. The Plaintiff refused to unlock the door as ordered by the officer. And began swearing at the officer and calling him vulgar names. The officer slapped him. Once.

---

[81] *Britschge v. Harmison*, 947 F.Supp. 435 (D.C. Kan. 1996).

That case bears absolutely no similarities whatsoever with the case at bar.  D.B. never committed a crime, nor was she suspected of having committed a crime. She never cursed at Casebolt, resisted, or called him any types of names.  In fact, Casebolt was the one who was belligerent and "out of control."  He was yelling, swearing and cursing and calling her, a child, obscene, vulgar names.  He repeatedly called her a "motherfucker" during his brutal assault.

Casebolt proudly declares that he "did not even strike D.B." True, he did not "strike" her. However, Casebolt twisted D.B.'s arm. He threw her on the ground. He yanked her up. He slammed her on the concrete sidewalk. Then he viciously jerked her up again. And threw her back to the ground. And slammed her face into the dirt. Then he dragged her across the ground. AND SAT ON HER!!!  Casebolt carried out these heinous acts unprovoked. This violent attack does not begin to compare to a single slap to a combative adult male. And to even make the attempt to compare the two cases should shock and disgust the Court.

**_Mitchell v. Yeadon Borough_**.

Casebolt also cites _Mitchell v. Yeadon Borough_.[82]  In that case an officer used pepper spray on an adult female who was actively resisting a lawful arrest for fighting.  According to Casebolt's analysis, the Plaintiff was load, aggressive, and uncooperative.

First, stating the obvious, utilizing pepper spray on an adult who is actively resisting a lawful arrest is not analogous to body slamming a child on concrete for "running her mouth."

---

[82] _Mitchell v. Yeadon Borough_, 2002 WL 265021 (E.D.Pa. 2002).

D.B. is a child. She never committed any crimes. Nor was she suspected of any crimes. She was never combative nor aggressive. She never posed a threat to Casebolt. D.B. was never under arrest. Nor did she ever resist detention. In fact, when Casebolt finally stopped sitting on her, D.B. laid there on the ground and held her own hands behind her back, even though she was not in cuffs.



***Brown v. Gilmore*[83]**

In this case, the Plaintiff was involved in a traffic accident.  She was subsequently handcuffed and taken into custody failing to comply with the officer's order to move her vehicle from the street.  She resisted.

The level of force used in this case cannot begin to compare to the brutal attack Casebolt levied on a CHILD. The fact that there was a crowd present at one point is irrelevant.  The crowd in the present case was not volatile. In fact, Casebolt was the ONLY person who was volatile,

---

[83] *Brown v. Gilmore*, 278 F.3d 362 (4th Cir. 2002).

aggressive, and belligerent. At the time of Casebolt's attack, he singled D.B. out as she was leaving.

Once again, this case is not analogous.  A completely different set of circumstances involving

yet another adult. She was only placed in handcuffs, not body slammed on concrete or sat on.

### Case v. Stewart[84]

In this case, police were called to party to investigate a report of an assault with a deadly weapon.  The officer pushed the male Plaintiff who fell to the ground.

Again, here the level of force is not comparable to that of the instant case. This was one shove. Here, Casebolt launched a brutal sustained attack on D.B., a young girl, that lasted several minutes. Casebolt took a break to assault a few boys who had come to check on D.B. Then, without provocation, while D.B. was sitting on the ground, not resisting, not attempting to flee, not posing a threat, Casebolt began assaulting D.B. again. The entire time, D.B. was compliant and was not struggling or resisting.  These are completely different circumstances and levels of force used.

### Arshad v. Congemi[85]

In *Arshad v. Congemi* a doctor stopped to assist at the scene of a traffic accident. Police arrived and ordered her to cease her activities and to not touch the child who had been injured. Plaintiff refused to comply and kept proceeding toward the injured child. Plaintiff struggled with the officer. Officer swept her legs from under her and knelt on her back.

Although this is a 5th Circuit case, it is also not analogous. First, D.B. is a child. Unlike the Plaintiff in *Arshad*, there  was  no  belief  that  D.B. posed a threat to anyone.  Furthermore, D.B. complied with Casebolt's orders.  She was leaving when Casebolt began assaulting her.

---

[84] *Case v. Stewart*, 2007 WL 37741 (W.D.N.C. 2007).
[85] *Arshad v. Congemi*, 2009 WL 585633 (5th Cir. 2009) (unpublished opinion).

Casebolt makes the assertion that the "use of force was less substantial than the force used against Dr. Arshad. Cpl. Casebolt did not sweep D.B.'s legs out from under her, as did the Officer in the Arshad case." This is categorically false. Casebolt slammed D.B. on the concrete. He dragged her across the ground. And he put his knee on her NECK. Casebolt did not handcuff D.B. immediately, like the Plaintiff in *Arshad*. Instead he sat on D.B. for several minutes to detain her, even though she posed absolutely not flight risk.

Once again, this is another poor attempt to compare apples to oranges. The level of force used in the referenced case pales in comparison to the attack on D.B. This case is not analogous.

None of the cases referenced are remotely analogous to the present case. The level of force used in the present case far exceeds that of any of the cases referenced. And none of the cases involved the use of force against a non-threatening female child. Even if the Court were to find the cases analogous, their precedent is not controlling in the 5th Circuit.

## B.   D.B. CAN SHOW CASEBOLT VIOLATED CLEARLY ESTABLISHED LAW – UNDER THE PARTICULARIZED FACTS OF THIS CASE – TO OVERCOME THE SECOND PRONG OF QUALIFIED IMMUNITY

*Haggerty* established that the federal qualified immunity defense and the Texas official immunity defense are to be evaluated substantially the same way.[86]

The Fourth Amendment clearly establishes the right of individuals to be free from use of excessive force. Texas Penal Code 22.01 prohibits:

(1)   intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;
(2)   intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse;  or
(3)   intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

---

[86] *Haggerty*, 391 F.3d at 658.

In the interest of conserving space, Plaintiff incorporates the same set of particularized facts found on page 23, *infra*. Casebolt continues to misconstrue the facts which are clearly depicted and supported by the video evidence.

The context in which the use of force occurred was although the scene was somewhat chaotic, it was not volatile. Casebolt was the only one who was volatile.  The kids were confused and baffled by Casebolt's actions. It was difficult for the children to understand a lawful command coming from someone who was acting so unlawfully and erratically. Casebolt ordered people who lived there to leave. He ordered D.B. on the ground after he pulled her up from her sitting on the ground.  Casebolt was belligerent. He was vulgar. He was yelling obscenities and cursing at children. Casebolt was completely out of control. He made the situation much worse.  Casebolt created the chaos.

When Casebolt approached D.B. she was leaving the scene. D.B. was not disobeying orders. D.B. was not committing a crime. D.B. was not fleeing. D.B. was not resisting. She was complying by leaving.

At the time, D.B. was a 15 year old girl in a bikini weighing approximately 100 pounds. Casebolt was an adult male wearing 30 pound of gear. Casebolt contends that D.B. was struggling with him so that is why he used the level of force he did. This is not a mischaracterization of the facts, it is simply a lie.  D.B. was nowhere near Casebolt when he decided to attack her. She was approximately 20 feet away. (See Exhibit D.) After Casebolt had D.B. on the ground, he kept pulling her up and slamming her back down. Casebolt had a hold of D.B.'s arm and was in complete control of her movements.  Even in the midst of being thrown around and slammed on the concrete, D.B. did not fight back.  She was not flailing about. She was not struggling with Casebolt. D.B. was terrified that Casebolt would kill her if she did not obey his every command. So she did.

No reasonable officer could believe that such use of force was necessary under the circumstances. Eleven other officers were present. None of them responded with such force.  In fact, a couple of officers attempted to deescalate Casebolt.  He pushed one of those officers away.

The level of force he used was unprecedented.  Casebolt violated clearly established law, including the 4th Amendment and Texas Penal Code 22.01. Casebolt's qualified immunity claim would fail.

## CASEBOLTS SUMMARY JUDGMENT FAILS

**A.    A genuine issue of material fact exists with regard to Plaintiffs' excessive-force claim.**

To establish a claim of excessive force under the Fourth Amendment, Plaintiff must demonstrate: "(1) an injury that (2) resulted directly and only from a use of force that was excessive to the need and that (3) the force used was objectively unreasonable."[87] Here, Casebolt does not dispute that D.B. suffered an injury, that resulted directly and only from the use of force that was excessive to the need and that D.B. suffered an injury.  In fact, Casebolt does not even properly identify the criteria that this Court must consider when concluding whether his acts were excessive and objectively unreasonable (severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight).

Accordingly, the law and the summary judgment evidence raise a question of fact as to whether it was reasonable for Casebolt to use the force on D.B. In fact, Casebolt does not even properly identify the criteria that this Court must consider when concluding whether his acts were excessive and objectively unreasonable (severity of the crime at issue, whether the suspect poses

---

[87] *Geils*, 941 F. Supp. 2d at 727 (citing *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)).

an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight).

Plaintiff respectfully submits that Casebolt has not shown why he is entitled to qualified immunity. In her First Amended Complaint, Plaintiff alleged the following facts to support her claim of excessive force:

> Plaintiff would show that at all times material hereto, Defendant Casebolt had a duty to avoid infliction of unjustified bodily injury to D.B., to protect her bodily integrity and to not trample on her constitutional rights.

> Plaintiff would show that Defendant Casebolt failed to act as a reasonable police officer would have acted in the same or similar circumstances. That is, Defendant Casebolt, without justification and the need to do so, grabbed and slammed D.B. to the ground and used excessive force as described above and injured D.B. without probable cause and/or legal justification. D.B. never made any threatening gestures towards the Defendant Casebolt and could not escape the physical assault.

> Defendant Casebolt's actions were not objectively reasonable because he followed a procedure designed to inflict excessive force in restraining a minor child in a non-life threatening situation.

> Plaintiff would show that the Defendant Casebolt denied D.B. her right to be free from deprivation of her rights without due process of law, in violation of the Fourth Amendments to the United States Constitution. Plaintiff would further show that Defendant Casebolt was acting within the custom, policy, practice and/or procedures of the MPD in regards to the use of excessive force as authorized and/or ratified by the McKinney City Council and Chief Conley at the time of the incident.

> The force used by the Defendant Casebolt was unnecessary and unreasonable under the circumstances, as D.B., namely cooperating with Defendant Casebolt, did not require the use of such excessive force. D.B. was complying with the instructions given by Defendant Casebolt when Defendant Casebolt for no lawful reason attacked her. Defendant Casebolt had no probable cause to suspect that a crime was being committed or that her conduct was reasonable. Plaintiff would further show that as a result of these violations of D.B.'s rights, Plaintiff has suffered damages within the jurisdictional limits of this court.

First Amended Complaint (Doc. 50 ¶¶ 60 – 64).

These are factual allegations and not conclusory statements regarding ultimate legal issues.

For all of these reasons, Plaintiff respectfully submit that these facts, if accepted as true, could

permit this Court to draw the reasonable inference that Casebolt's use of excessive force was unreasonable and the underlying cause of the injuries suffered by D.B. in violation of his constitutional rights.

**B.      Severity of the crime at issue.**

Casebolt offers no evidence with regard to the severity of the crime at issue. As aforesaid, Casebolt's claims are inconsistent with the video of the incident. A review of the video plainly reveals that D.B. was not actively resisting, that Casebolt approached D.B. in a very aggressive manner, twisted her arm behind her back, threw her on the ground, yanked her up by her arm, and violently slammed D.B. onto the concrete sidewalk.  But even assuming – without conceding – that the Casebolt's allegations were true, this allegation would only support suspicion of interfering with public duties, which is a class B misdemeanor.[88]

To the extent there is any allegation to suggest that D.B. was committing a "severe crime" at the time he arrived, Plaintiff respectfully submits that is plainly inconsistent with both the law and the facts. In sum, Casebolt had no reason to believe that D.B. was engaged in anything more than conduct that could constitute a Class B misdemeanor, which is almost the lowest degree of criminal offense under Texas law.

**C.      There was no immediate threat to the safety of the officer or others**

As argued above, Casebolt presents no credible evidence whether he had any reason to believe that D.B. had engaged in "violent conduct" or any "severe" criminal activity whatsoever. A fight, which had ended before Casebolt arrived, identified a female wearing black shorts.  D.B. was clearly wearing a bright yellow bikini.  Casebolt's assertion that D.B. was a suspect is false. It is nothing more than excuse in hindsight to justify Casebolt's actions. At the time of the offense,

---

[88] Tex. Penal Code § 38.15

Casebolt's attorney, speaking on behalf of Casebolt admitted that Casebolt let his emotions get the best of him."[89]   Furthermore, Casebolt's own statements contradict his allegation that D.B. was a suspect. Casebolt stated that he ordered individuals who "had not been running or otherwise acting suspiciously."[90]   Yet, Casebolt asserts that he ordered D.B. to leave several times.

Having established that there is (at the very least) a fact issue with regard to whether Casebolt had any reason to believe that D.B. had engaged in "violent conduct" or any "severe" criminal activity whatsoever, the Court must next consider whether D.B. posed an immediate threat to Casebolt or was actively resisting detention/arrest. As the evidence presented indicates, D.B. did not pose an immediate threat to Casebolt, nor was she actively resisting, a fact that Casebolt does not deny. In fact, the video of the incident negates that argument and clearly shows that D.B. was not a threat to the safety of Casebolt or anyone at the time of the incident.[91]

Once again, Casebolt has provided no evidence whatsoever which would suggest his conduct was "objectively reasonable" as a matter of law.  In fact, Casebolt's conduct not only violated D.B.'s civil rights under the U.S. Constitution, it also violated police policy, and Texas state law as well.   Casebolt violated Texas Penal Code §22.01 by intentionally, knowingly, or recklessly causes bodily injury to D.B., and by intentionally or knowingly causes physical contact with D.B.[92]   Breaking the law and violating D.B.'s constitutional rights is not reasonable.

In sum, Casebolt's conduct was not "objectively reasonable" as a matter of law.  D.B. was a hundred pound, 15-year old girl who was not a threat, was not accused nor suspected of committing a crime, nor was she interfering with Casebolt's duties. Yet Casebolt utilized excessive

---

[89] Exhibit I (Casebolt Attorney Video at 3:54).
[90] Casebolt Declaration, Apx. p. 5 ¶ 14.
[91] YouTube Video at 1:20 and 2:21; Exhibits D and E.
[92] Tex. Penal Code § 22.01

force to take her into custody with no probable cause.  Eleven other officers under the exact same circumstances, with the same training who did not act as Casebolt did.

Finally, McKinney Police Chief, Greg Conley, who is responsible for assuring that the entire McKinney Police Department complies with the law and department policies, called Casebolt's actions "out of control" and "indefensible."[93]   Chief Conley asserted that the other eleven officers who responded to the scene conducted themselves reasonably. "I had twelve officers on the scene and eleven of them performed according to their training. They did an excellent job."[94]

### D.      A reasonable officer would have concluded that Casebolt used excessive force.

Once again, Casebolt would like for the court to believe that the right to be free from excessive force was not clearly established at the time the incident that is the subject of this suit took place. Casebolt, however does not claim that – as a matter of law – "a reasonable police officer could have believed that his decision to use force against D.B. was lawful."  To support this argument, however, Casebolt provides no evidence and instead relies on the argument of his counsel. Eleven other officers were on the scene. None engaged in the actions which Casebolt did.

But even if this Court were to ignore all of the factual discrepancies between Casebolt's account of the events and those of the witnesses to the incident, Plaintiff also offers in response to Casebolt's Reasserted Motion for Summary Judgment, the sentiment of Casebolt's superior. Chief Conley stated unequivocally:

> The actions of Casebolt as seen on the video of the disturbance at the community pool are indefensible. Our policies, our training, our practice do not support his actions.  He came into the call out of control.  And as the video shows, was out of control during the incident.  I had twelve officers on the scene and eleven of them performed according to their training.[95]

---

[93] Exhibit H – Chief Greg Conley Press Conference Video at 0:18-0:45.
[94]*Id.* at 0:38–0:47.
[95] *Id.* at 0:18–0:45.

Therefore, eleven reasonable police officers, having the same information and exact same set of facts as Casebolt, and having the training of Casebolt, realized that D.B. presented no threat to the officers or the safety of others.

**E.      Casebolt's actions violated McKinney Police policy.**

McKinney Police General Order 901.00 – Response to Resistance (Use of Force) provides a continuum of the levels of force to be used based upon the totality of the circumstances.[96] Factors to be considered include:

1. The nature of the offense
2. The behavior of the subject against who force is to be used:
   (a) Verbal dialogue
   (b) Physical resistive actions
   (c) Aggressive acts
3. Age and physical condition of the subject
4. Age and physical condition of the officer
5. Physical and environmental conditions at the scene
6. The feasibility or availability of alternative actions

Based upon these circumstances: 1) No crimes were committed; 2) D.B. did not resist nor was she aggressive; 3) D.B. was a minor who barely weighed 100 pounds; and 4) Casebolt was a physically fit adult male, Casebolt's actions far exceeded the level of force necessary for the circumstances as permitted under McKinney Police Department policy.

D.B. was not an active threat to Casebolt or anyone else. D.B was complying with Casebolt's orders just prior to being slammed on the ground. No reasonably trained law enforcement could conclude, based on the information available to Casebolt at the time he took D.B. to the ground, that such a forceful takedown was required or necessary.  Put otherwise, Casebolt's conduct was so egregious, a reasonable jury could conclude that Casebolt was either plainly incompetent or knowingly violated the law. Because the evidence presented and

---

[96] Exhibit C at p. 1–2.

declarations asserted are sufficient to demonstrate that a genuine issue of material fact exists with regard to whether Casebolt's actions were reasonable, Casebolt is not entitled to summary judgment on Plaintiff's excessive-force claim.

## VII.     CONCLUSION AND PRAYER

The attached evidence and objections, plainly establish that Casebolt's account of what happened on the day he injured D.B. through the use of excessive force is riddled with factual discrepancies. The veracity of Casebolt's allegations are inconsistent with the video as well as the declaration of the Plaintiff. Moreover, even if this Court were to consider Casebolt's unsworn, undesignated, conclusory, and self-serving opinions about the purported reasonableness of his conduct, it is completely contradicted by YouTube Video, Plaintiff's declaration, McKinney Police Chief Greg Conley, and the McKinney Police Department policies.

Presented in the light most favorable to Plaintiffs, the evidence clearly establish that Casebolt's acts were unreasonable.  Eleven other officers on the scene and not a single one utilized the level of force that Casebolt did.

Thus, Plaintiffs have adequately identified genuine issues of material fact as to whether Casebolt's use of deadly force was objectively unreasonable under clearly established law. Accordingly, Casebolt's Reasserted Motion for Summary Judgment based on qualified immunity should be denied.

WHEREFORE, PREMISES CONSIDERED, for all of these reasons, Plaintiff respectfully requests this Court to deny Casebolt's motion in its entirety, or in the alternative, grant Plaintiff leave to amend her pleadings, and grant such other and further relief, both general and special, at law and in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

/s/  Kim T. Cole
KIM T. COLE
Texas State Bar No. 24071024
**K. COLE LAW, PLLC**
2770 Main Street, Suite 103
Frisco, Texas 75033
(214) 702-2551
(972) 947-3834 (fax)
kcole@kcolelaw.com

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I, the undersigned counsel, certify that on July 6, 2017, that I electronically transmitted the

attached document to the Clerk of Court using the ECF System for filing. Based on the records

currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all applicable

ECF registrants:

/s/ Kim T. Cole
Kim T. Cole